UNITED STATES *v.* PARTELLO.

*(Circuit Court, D. Montana.  November 23, 1891.)*

1. INDIANS—FEDERAL JURISDICTION—RAPE IN "INDIAN COUNTRY."
    Rev. St. U. S. § 5345, provides for the punishment of rape committed in any of the places mentioned in section 5339, and the latter section specifies, among others, "any fort * * * or district of country under the exclusive jurisdiction of the United States." Section 2145 declares that, "except as to crimes the punishment of which is expressly provided for in this title, the general laws of the United States as to the punishment of crimes committed within the sole and exclusive jurisdiction of the United States * * * shall extend to the Indian country." *Held* that, as the punishment of rape is not specified in the title mentioned, a rape committed in "the Indian country" is punishable under section 5345.

2. SAME—WHAT IS "INDIAN COUNTRY"—RESERVATIONS.
    Prior to the admission of Montana as a state, the Crow Indian reservation situated therein was part of the "Indian country," within the meaning of Rev. St. § 2145, extending the general criminal laws of the United States over the Indian country.

**3. SAME—EFFECT OF ADMITTING TERRITORY.**

Act. Cong. Feb. 22, 1889, providing for the admission of Montana and other territories into the Union, provides, in section 4, that "the people inhabiting said proposed states do agree and declare that they forever disclaim" all right to the lands therein held by Indian tribes, and that until the Indian title is extinguished the same shall remain subject to the disposition and "under the absolute jurisdiction and control" of congress, and this provision was incorporated into the constitution of Montana. *Held* that, in view of the fact that the United States, by the treaty of 1868 with the Crow Indians, agreed that no persons except certain employes of the government should ever be permitted to "pass over, settle upon, or reside in" the reservation thereby set apart to them in Montana, the jurisdiction reserved to the United States was intended to apply to persons, as well as to the lands themselves; and hence, under Rev. St. U. S. § 2145, which extends the general criminal laws of the United States to "the Indian country," the federal courts have jurisdiction to punish a rape committed on the reservation by a white man against a white woman.

**4. SAME—CONSTITUTIONAL LAW.**

The people of Montana had full power, under the constitution, to thus relinquish to the United States all jurisdiction over the Indian reservations.

**5. SAME—FEDERAL PURPOSE.**

In view of the fact that the United States has always assumed control over the Indians, as the wards of the nation, to the exclusion of the states, the relinquishment by the state of jurisdiction over the Indians' reservation was for a "federal purpose."

At Law. Prosecution of Fred Partello for rape. On demurrer to a plea to the indictment. Demurrer sustained.

*Elbert D. Weed*, U. S. Atty.

*Rufus C. Garland*, for defendant.

KNOWLES, J. In this case the defendant, Fred Partello, is charged in an indictment found by a grand jury, impaneled in this court, with the crime of rape, committed upon a white woman within the limits of the Crow Indian reservation, state of Montana. Defendant interposed a plea to the indictment, and specified as a ground therefor that this court had no jurisdiction of the offense charged, by reason of the fact that the defendant is a white man, and the person on whom the offense was committed is a white woman. The United States interposed a demurrer to this plea. Defendant urges that as it is admitted that defendant is a white man, and the woman upon whom the offense was committed, or it is charged was committed, is a white woman, the offense was cognizable, if at all, in the state courts of Montana. A portion of section 5339 of the Revised Statutes of the United States provides:

"Every person who commits murder—*First*, within any fort, arsenal, dockyard, magazine, or in any other place or district of country under the exclusive jurisdiction of the United States; * * * *second*, or upon the high seas, or in any arm of the sea, or in any river, haven, creek, basin, or bay, within the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular state; *third*, or who upon any such waters maliciously strikes, stabs, wounds, poisons, or shoots at any person, of which striking, stabbing, wounding, poisoning, or shooting such other person dies, either on land or at sea, within or without the United States, shall suffer death."

Section 5345 of said Statutes provides:

"Every person who within any of the places, or upon any of the waters, specified in section fifty-three hundred and thirty-nine, commits the crime of rape shall suffer death."

These two provisions of the statute, construed together, make the crime of rape committed in a place within the exclusive jurisdiction of the United States an offense against its laws.

Section 2145 of said Revised Statutes provides:

"Except as to crimes the punishment of which is expressly provided for in this title, the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia, shall extend to the Indian country."

The crime of rape is not provided for in that title, and it is a crime for which the general laws of the United States provide a punishment, as I have shown, when committed in a place within the exclusive jurisdiction of the United States, and hence must be an offense against such laws when committed in the Indian country. The next point, then, for determination is, what is Indian country? In the case of *Bates* v. *Clark*, 95 U. S. 204, the supreme court held:

"The simple criterion is that, as to all lands thus described, it was Indian country whenever the Indian title had not been extinguished, and it continued to be Indian country so long as the Indians had title to it, and no longer. As soon as they parted with the title, it ceased to be Indian country, without any further act of congress, unless by the treaty by which the Indians parted with their title, or by some act of congress, a different rule was made applicable in the case."

This rule as to what constituted Indian country was affirmed in the case of *Ex parte Crow Dog*, 109 U. S. 556, 3 Sup. Ct. Rep. 396; and of the above definition the supreme court said:

"In our opinion, that definition now applies to all the country to which the Indian title has not been extinguished, within the limits of the United States, even when not within a reservation expressly set apart for the exclusive occupancy of Indians, although much of it has been acquired since the passage of the act of 1834, and notwithstanding the formal definition in that act has been dropped from the statutes, excluding, however, any territory embraced within the exterior geographical limits of a state, not excepted from its jurisdiction by treaty or by statute at the time of its admission into the Union, but saving even in respect to territory not thus excepted, and actually in the exclusive occupancy of Indians, the authority of congress over it under the constitutional power to regulate commerce with the Indian tribes, and under any treaty made in pursuance of it."

In the case of *U. S.* v. *Le Bris*, 121 U. S. 278, 7 Sup. Ct. Rep. 894, the supreme court held that "the reservation of the Red Lake and Pembina Indians in Polk county, Minn., is Indian country." In the case of *U. S.* v. *Martin*, 14 Fed. Rep. 817, Judge DEADY held that "Indian reservations" were "Indian country." Many other decisions from the United States circuit court might be cited to the same effect.

Considering the Crow Indian reservation, which will hereafter be described, and the above definitions of "Indian country," and there can be no doubt but it belongs to that character of country denominated

" Indian," unless the admission of Montana as a state in the Union changed its character in this respect. The point is presented, then, did this admission of Montana as a state in the Union cause the Crow Indian reservation to cease being that character of a region classed as Indian country? The able counsel for defendant maintains that it did, and that it came under the jurisdiction of the state, at least to the extent of allowing it to punish offenses committed by one white man against another white man. In other words, whatever jurisdiction the United States had over this Indian reservation before Montana was admitted into the Union was abrogated and repealed by the act of admission, and the state of Montana acquired full authority over the same, and the right to legislate for the inhabitants thereof, except as to those cases pointed out for national legislation in the constitution of the United States, or which are implied from the constitutional right of congress to regulate commerce among the Indian tribes; hence no longer could congress exercise the combined power of a state and national government over said reservation, but only the powers which pertained to a national government. The point here presented is, it appears to me, one of considerable difficulty and importance, and to some extent the court is left without adequate judicial determinations for the decision of the same.

Let us consider whether or not there could be any limit upon the authority of the state government over this reservation by any proceeding on its part coupled with reservations in the act admitting Montana into the Union as a state.

In the case of *U. S.* **v.** *McBratney,* 104 U. S. 621, the supreme court, while holding that the **act** admitting Colorado into the Union so modified the term "Indian country" that the United States had no jurisdiction of the crime of murder committed by one white man upon another on the Ute reservation, used this language as to the admission act of Colorado: "And the act contains no exception of the Ute reservation, or of jurisdiction over it;" clearly intimating that it might have made a difference with the rule established in that case, if it had. In the case of *Ex parte Crow Dog, supra,* it will be observed that this language was used in defining Indian country: "Excluding, however, any territory embraced within the exterior geographical limits of a state not excepted from its jurisdiction by treaty, or by statute, at the time of its admission into the Union." Here it is intimated that, if by a statute, at the time of admission of a state in the Union, any portion of the same was excluded thereby from the jurisdiction of the state, such portion of said state would remain Indian country. It would seem, also, from that decision, that, although a portion of a state was not excepted from the jurisdiction thereof by treaty or statute, yet, if occupied by Indians, congress might have jurisdiction over the same under the constitutional power to regulate commerce with the Indian tribes, and under any treaty made in pursuance of it. Under the last power, it would have to appear that the offense charged in some way interfered with commerce with the Indian tribes. But the right to legislate for Indian country was not so limited. In the case of *U. S.* v. *Ward,* 1

v.48F.no.8—43

Woolw. 17, Justice MILLER, while holding that the act admitting Kansas into the Union repealed the jurisdiction of the United States over any portion of the state which had before that time been classed as Indian country within its borders, which was not excepted from the limits of the state by treaty with the Indians and some provision in the admission act, says:

"And the converse of this proposition is inferable; that is, that congress intended to and did concede to the new state, and it acquired and holds irrevocably, except as it sees fit to surrender the same, full right and authority to legislate to enforce her laws and to exercise plenary jurisdiction over all such parts of her territory as were not covered by such treaties."

Here it is intimated that, if Kansas had seen fit to surrender its jurisdiction over any portion of her territory to the United States, it would not have plenary jurisdiction over the same.

Taking these decisions together, and there is an intimation that in the act, in admitting a state into the Union, there might be a statute or a treaty by which a portion of the territory of such state might remain under the jurisdiction of the United States, or the state might cede its jurisdiction over certain territory to the United States. Judge DILLON, in the case of *U. S.* v. *Yellow Sun,* 1 Dill. 272, said of the opinion of Justice McLEAN, in *U. S.* v. *Bailey,* 1 McLean, 234, upon which the counsel for defendant places much reliance:

"In view of the peculiar relations of the Indian tribes, I think I ought to observe that I am not at present prepared to yield assent to the opinion which Mr. Justice McLEAN seems to have entertained in *Bailey Case,* that congress had no power to pass the act of 1817, (3 St. 383;) that is, that congress could not, if it saw fit, make punishable in national courts offenses committed by or against Indians upon reservations in state limits. And it might be worth the consideration of congress whether some such legislation might not be expedient."

Here is an intimation that, in the opinion of that distinguished jurist and writer, congress might enact a statute punishing a white man for an offense committed upon an Indian, upon a reservation within the limits of a state, and this right is not placed upon the power to regulate commerce among Indian tribes. This would be the assertion of jurisdiction over a white man upon an Indian reservation by the United States in matters other than those within the peculiar and specific jurisdiction of the general government.

Let us see what congress and Montana have done toward conferring the jurisdiction of the United States over the Crow Indian reservation. In an act entitled "An act to provide for the division of Dakota into two states, and to enable the people of North Dakota, South Dakota, Montana, and Washington to form constitutions and state governments, and to be admitted into the Union on an equal footing with the original states," etc., approved February 22, 1889, in reference to the convention in each territory named, organized to form a constitution for the proper state, we find the following, in section 4:

"That the people inhabiting said proposed state do agree and declare that they forever disclaim all right and title to the unappropriated public lands ly-

ing within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States. * * * But nothing herein, or in the ordinances herein provided for, shall preclude the said states from taxing, as other lands are taxed, any lands owned or held by any Indian who has severed his tribal relations."

In compliance with this provision of the statute under which Montana was admitted into the Union, the convention that framed the constitution adopted by the people of Montana provided by ordinance as follows:

"That the people inhabiting the said proposed state of Montana do agree that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States they shall be and remain subject to the disposition of the United States; and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States; * * * that the ordinances of this article shall be irrevocable, without the consent of the United States and the people of the state of Montana."

It is evident that the lands referred to in this ordinance, and the lands in the statute mentioned, over which the congress of the United States was to retain absolute jurisdiction, were the Indian lands to which the Indians held but the right of occupancy. The question here presented is, what did congress intend by the clause, "and said Indian lands shall remain under the absolute jurisdiction and control of the United States;" and what did the convention that framed the Montana constitution intend by it? This provision does not occur, as far as I have been able to investigate, in the acts providing for the admission of any other states into the Union than in the one above referred to. And I am not apprised that any ordinances similar to the one named above were ever adopted by any other states than those enabled to form constitutions under the same act which gave that privilege to the people of Montana. In the first part of the portion of section 4 of said act quoted above it appears that, as an individual proprietor, the United States was fully protected in regard to its rights to Indian lands, and the Indians were protected in their rights of occupancy. It does not seem that the clause under consideration could add anything to the rights of the United States in regard to these lands as a proprietor. In Montana there were no Indian lands save those included in Indian reservations, except some lands held by certain of the Flat Head Indians in the Bitter Root valley. These lands were held in severalty, and they had a title from the United States to the same different from that of the right of occupancy. Evidently they were no part of the Indian lands referred to. As I have said, these were lands to which the Indians held only the title of occupancy, and which the United States reserved the right to dispose of, not lands granted to Indians in severalty. It is reasonable to suppose that congress passed

the above act, and the people of Montana adopted the above ordinances, with reference to the fact that Indian lands proper were those included in the Indian reservations. It was agreed by the ordinance above referred to that congress was to retain the absolute jurisdiction and control over these Indian lands within the Indian reservations in Montana. The word "jurisdiction," as used in the above clause, when applied to congress, means the power of governing such lands; to legislate for them; the power or right of exercising authority over them. These are the definitions of this word which will be found in Webster's Dictionary. When we speak of the right to govern certain lands, we not only mean the right to do some thing with the land itself, but to legislate for and control the people upon said lands, as well as to legislate concerning the land itself. When we say congress has the right to legislate for a place within its exclusive jurisdiction, we mean for the people who are there, as well as concerning the land itself. In the case of *U. S.* v. *Ward, supra,* Mr. Justice MILLER, after speaking of the treaty with the Shawnee Indians which excluded their reservation from the state of Kansas, and after declaring to some extent the effect of the act admitting Kansas into the Union, said, further:

"Or, rather, to express the matter more exactly, all territory which was not covered by such treaties was included within the state, its jurisdiction, and within its territory, and this irrevocably and exclusively."

In a treaty with the Crow Indians made by the United States in 1868, after describing the tract of land set apart as a reservation for these Indians, there is this clause, in reference to this tract:

—"Shall be and the same is set apart for the absolute and undisturbed use and occupation of the Indians herein named, and for such other friendly tribes or individual Indians as from time to time they may be willing, with the consent of the United States, to admit amongst them; and the United States now solemnly agrees that no person except those herein designated and authorized so to do, and except such officers, agents, and employes of the government as may be authorized to enter upon Indian reservations in discharge of duties enjoined by law, shall ever be permitted to pass over, settle upon, or reside in the territory described in this article for the use of said Indians, and henceforth they will and do hereby relinquish any portion of the territory of the United States except such as is embraced within the limits aforesaid."

Now, if it should be held that, in the language of Mr. Justice MILLER in *U. S.* v. *Ward, supra,* the act of congress admitting Montana into the Union awarded it "all territory, which was not covered by such treaties, [as that with the Shawnees, which the Crow treaty is not,] was included within the state, within its jurisdiction, and within its territory, and this irrevocably, unqualifiedly, and exclusively," what became of this treaty with the Crows, so solemnly entered into? In its main features it was broken by that act, with that construction forced upon us. Did congress intend to do this? Is it not more reasonable to infer that congress intended by the clause referred to to reserve the power to observe that treaty and others of a similar character? It does appear to me that not only the language of said clause, but the circumstances which con-

fronted congress, must have been such as to leave no room to doubt that it was the intention that such Indian reservations as the Crow should be left under the jurisdiction and control of the national government, as long as the lands therein remained Indian lands.

It was urged upon the court, upon the argument of this case, that the people of Montana would have no right to agree as they did in the ordinance before mentioned, and permit a portion of its territory to remain under the jurisdiction of the national government.

In the case of *Railroad Co.* v. *Lowe,* 114 U. S. 525, 5 Sup. Ct. Rep. 995, the supreme court, while holding that a state could not cede any of its lands to a foreign country because of the rights of the national government, said:

" In their relation to the general government, the states of the Union stand in a very different position from that which they hold to foreign governments. Though the jurisdiction and authority of the general government are essentially different from those of the state, they are not those of a different country, and the two—the state and general government—may deal with each other in any way they may deem best to carry out the purposes of the constitution."

And it was held in that case that a state could cede to the United States for federal purposes a tract of land within its limits in a manner not provided for specifically in the constitution of the United States. It would seem that there is no legal objection to the agreement made by the people of the state of Montana in convention assembled to the effect that congress should retain jurisdiction and control over the Indian reservations within its borders.

Was this relinquishment of jurisdiction and control a federal purpose? The United States, from the earliest organization of the national government, has assumed control over the several Indian tribes in the United States, and has denied such control to the state governments. In the case of *U. S.* v. *Kagama,* 118 U. S. 375, 6 Sup. Ct. Rep. 1109, the supreme court held that the Indian tribes were subject to the control of the United States, and could be made subject to its laws; that the states have no power to subject Indians to their laws as long as the Indians maintain their tribal relations; that the Indians owe no allegiance to the states within which their reservations may be established, and the state gives them no protection. It was also pointed out that the United States had undertaken to control Indians no longer by treaties, but by laws; and that this right did not come wholly from the power of congress to regulate commerce among the Indian tribes, but from the fact that congress had always assumed the control over them, as the wards of the nation, and as dependents upon the national government, and had always refused to accede such powers to the states. It appears to me, with such a view of the law, the United States would have the right to retain and reserve lands within a state upon which to place these wards,—these dependents,—with a view to their government, and that the states would have the right to agree to such a reservation. It would be an anomaly in government if it should be conceded that the United States has full right to

govern the Indians, and yet has no right to any lands upon which to place them with that object. Considering what was said of the relation of the Indians to the state governments in *U. S.* v. *Kagama, supra*, with such a view, we would behold a government without a country. The United States is not in this helpless position which such a contention would maintain. As an incident to the right to govern such people by its own laws would be the right to hold lands upon which to locate and maintain them. It was also urged that, while the United States could have jurisdiction over such lands as far as the Indians are concerned, it would have no right over white men found within an Indian reservation, such as the Crow reservation. The statute and the ordinance we have been considering say the jurisdiction and control is absolute, not a divided jurisdiction or control; and it would seem to me that this is proper. Any other view might bring on collisions between the authorities of the two governments. The white men it was contemplated who would be upon this reservation would be employes or officers of the national government; and with the view of protecting the Indians, the United States should have control over the white men upon an Indian reservation as well as of the Indians. The Crow Indian reservation, notwithstanding the act admitting Montana into the Union, remains, then, Indian country, absolutely within the jurisdiction of the United States. The general criminal laws of the United States were then in force upon it. With this view, the defendant, it must be held, was properly charged. The demurrer to the plea to the indictment is sustained.