STATE, Respondent, *v.* MONROE, Appellant.

(No. 6,319.)

(Submitted December 6, 1928. Decided January 7, 1929.)

[274 Pac. 840.]

Mr. *John Collins*, Mr. *John W. Coburn* and Mr. *S. C. Ford*, for Appellant, submitted a brief; Mr. *Ford* argued the cause orally.

*Mr. L. A. Foot,* Attorney General, and *Mr. I. W. Choate,* Assistant Attorney General, for the State, submitted a brief; *Mr. S. R. Foot,* Assistant Attorney General, argued the cause orally.

MR. CHIEF JUSTICE CALLAWAY delivered the opinion of the court.

A state highway coming from the south and ending at the Canadian border skirts Glacier National Park. After dark on the evening of October 21, 1926, two youths, Omer Dillman and Elmer Allegree, were returning upon this highway from Babb to Glacier Park station, traveling in a Ford car; they were tourists lawfully pursuing their pleasures. At the same time three United States officers, Albert Betcher, Louis Monroe and Orrie Sheriff, whose duty it was to prevent liquor traffic with the Indians, stationed themselves at a point upon the highway near Divide Creek intending to apprehend one McCurdy, a notorious bootlegger and rum runner, or any other person who might be carrying intoxicating liquor into the reservation. It was the practice of these officers, it seems, without any search-warrant, to stop and search automobiles passing along the highway. They stopped several cars that evening. About 8 o'clock they spied the lights of an approaching car, which from the noise they judged to be a Ford. McCurdy was supposed to be running a Ford. Betcher, the superior officer, told Monroe to signal the car to stop, and this Monroe attempted by swinging his flashlight. Instead of stopping, the car seemed to be coming directly upon Monroe, who dodged and, as he did so, slipped, falling to his hands and knees. Arising, he drew his gun and began shooting at the tires of the car. He shot three times. The evidence indicates that Betcher and Sheriff also fired at the car. About seventy-five yards from where the officers were the car left the road and stopped. They went to it immediately and found that Dillman, the driver, had been shot in the head. The wound was caused by a bullet from Monroe's gun, which, however, had not gone from the gun directly to Dillman but

had first struck some object in transit and had ricocheted. Dillman died within a few hours. There was no liquor in the car.

On January 31, 1927, the county attorney of Glacier county filed an information against Betcher and Monroe charging them with the crime of manslaughter. On that day Monroe, now called the defendant, was arraigned and pleaded not guilty to the information. Counsel for defendant took steps to have the cause transferred to the United States district court for Montana, but on August 17, 1927, that court remanded the cause to the district court of Glacier county for trial. In November, 1927, upon trial, defendant was found guilty of manslaughter. The court entered judgment upon the verdict and the defendant appealed.

The first two specifications of error challenge the jurisdiction of the trial court. Counsel for defendant urge (a) that the testimony shows that the homicide occurred within the boundaries of the Blackfeet Indian reservation and upon tribal lands; (b) that the defendant is an Indian, a member of the Blackfeet tribe, and a ward of the government.

1. The fact alone that the homicide occurred within the boundaries of the reservation and upon tribal lands is not conclusive either way. If the crime had been committed by a white man at the time and place stated, the deceased being a white man, the state court assuredly would have jurisdiction (*Draper* v. *United States*, 164 U. S. 240, 41 L. Ed. 41, 17 Sup. Ct. Rep. 107; *State* v. *Big Sheep*, 75 Mont. 219, 243 Pac. 1067) ; if committed by an Indian still under governmental guardianship the jurisdiction would be in the federal court (U. S. Codes Ann., Title 18, Chap. 15, sec. 548; *State* v. *Big Sheep*, supra; *United States* v. *Pelican*, 232 U. S. 442, 58 L. Ed. 676, 34 Sup. Ct. Rep. 396; *Apapas* v. *United States*, 233 U. S. 587, 58 L. Ed. 1104, 34 Sup. Ct. Rep. 704), because in such case the Indian is a ward of the United States "in respect of whom there is devolved upon the federal government 'the duty of protection, and with it the power.'

(*United States* v. *Kagama,* 118 U. S. 375, 384 [30 L. Ed. 228,ˈ 6 Sup. Ct. Rep. 1109].)'' (*United States* v. *Ramsey,* 271 U. S. 467, 70 L. Ed. 1039, 46 Sup. Ct. Rep. 559.)

The attorney general argues that as the crime was committed upon a state highway "over which the United States had relinquished its exclusive jurisdiction" the state court has and the federal court has not jurisdiction. But it is not shown that the United States has relinquished jurisdiction over the land occupied by the highway. On the contrary, the testimony is, in effect, that the secretary of the interior granted to the state permission to establish the highway (see Title 25, U. S. C. A., Chap. 8, sec. 311), which was constructed jointly by the Federal Road Commission and the State Highway Commission. The right granted is an easement; "it is perpetual as long as the road is used as a public highway," according to Mr. Stone, assistant superintendent of the Blackfeet Indian reservation. This is consistent with *United States* v. *Soldana,* 246 U. S. 530, 62 L. Ed. 870, 38 Sup. Ct. Rep. 357, wherein the court said: "Whether these Acts should be held to have granted a mere easement or a limited fee or some other limited interest in the land (*New Mexico* v. *United States Trust Co.,* 172 U. S. 171, 43 L. Ed. 407, 19 Sup. Ct. Rep. 784; *Northern Pac. Ry. Co.* v. *Townsend,* 190 U. S. 267, 47 L. Ed. 1040, 23 Sup. Ct. Rep. 671; *Rio Grande Western Ry. Co.* v. *Stringham,* 239 U. S. 44, 60 L. Ed. 136, 36 Sup. Ct. Rep. 5), it is clear that it was not the purpose of Congress to extinguish the title of the Indians in the land comprised within the right of way. To have excepted this strip from the reservation would have divided it in two; and would have rendered it much more difficult, if not impossible, to afford that protection to the Indians which the provisions quoted were designed to ensure." Subject to the easement the land occupied by the highway is still a part of the reservation, within the "Indian country."

2. This brings us to the main question in the case: the status of the defendant as a citizen.

At the time of the homicide he was forty-five years old, born a member of the Blackfeet tribe. He was and is the head of a family. For ten or fifteen years he has been a police officer on the reservation, and for six or seven had been a "deputy special officer to assist in suppressing the liquor traffic among the Indians."

The witness Stone testified that the defendant is a "patent in fee Indian"; that the defendant had received a patent to a portion of his land; but eighty acres is held in trust for him.

In 1887 Congress provided "for the allotment of lands in severalty to Indians on the various reservations and to extend the protection of the laws of the United States and the Territories over the Indians, and for other purposes." (The Dawes Act, Chap. 119, 24 Stat. 388.) The Act contemplated the gradual extinction of Indian reservations and Indian titles by the allotment and patenting of the lands to the Indians in severalty. Limitations and restrictions were put upon the power of the Indians to sell, encumber or deal with the allotted lands. Section 6 of the Act provided, in part, that upon the completion of the allotments and the patenting of the lands to the allottees, "each and every member of the respective bands or tribes of Indians to whom allotments have been made shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory in which they may reside," and made provisions respecting their citizenship.

By reason of controversies arising over the citizenship provisions of section 6, Congress on May 8, 1906, amended it to read as follows: "That at the expiration of the trust period and when the lands have been conveyed to the Indians by patent in fee, as provided in section five of this Act, then each and every allottee shall have the benefit of and be subject to the laws, both civil and criminal, of the state or territory

in which they may reside; and no territory shall pass or enforce any law denying any such Indian within its jurisdiction the equal protection of the law. And every Indian born within the territorial limits of the United States to whom allotments shall have been made and who has received a patent in fee simple under the provisions of this Act, or under any law or treaty, and every Indian born within the territorial limits of the United States who has voluntarily taken up within said limits his residence, separate and apart from any tribe of Indians therein, and has adopted the habits of civilized life, is hereby declared to be a citizen of the United States, and is entitled to all the rights, privileges, and immunities of such citizens, whether said Indian has been or not, by birth or otherwise, a member of any tribe of Indians within the territorial limits of the United States without in any manner impairing or otherwise affecting the right of any such Indian to tribal or other property: Provided, That the secretary of the interior may, in his discretion, and he is hereby authorized, whenever he shall be satisfied that any Indian allottee is competent and capable of managing his or her affairs at any time to cause to be issued to such allottee a patent in fee simple, and thereafter all restrictions as to sale, incumbrance, or taxation of said land shall be removed and said land shall not be liable to the satisfaction of any debt contracted prior to the issuing of such patent: Provided further, That until the issuance of fee-simple patents all allottees to whom trust patents shall hereafter be issued shall be subject to the exclusive jurisdiction of the United States. * * * '' (Chap. 2348, 34 Stat. 182; and see U. S. C. A., Title 25, Chap. 9, sec. 349.)

In *United States* v. *Waller*, 243 U. S. 452, 61 L. Ed. 843, 37 Sup. Ct. Rep. 430, the court said: ''The tribal Indians are wards of the government, and as such under its guardianship. It rests with Congress to determine the time and extent of emancipation. Conferring citizenship is not inconsistent with the continuation of such guardianship, for it has been held

that even after the Indians have been made citizens the relation of guardian and ward for some purposes may continue. On the other hand, Congress may relieve the Indians from such guardianship and control, in whole or in part, and may, if it sees fit, clothe them with full rights and responsibilities concerning their property or give to them a partial emancipation if it thinks that course better for their protection." (*United States* v. *Nice,* 241 U. S. 591, 598, 60 L. Ed. 1190, 1192, 36 Sup. Ct. Rep. 696.)

That under the provisions of the Act of May 8, 1906, an Indian receiving a patent in fee to land claimed by him is a citizen of the United States, entitled to exercise and enjoy all the rights and privileges of citizenship and subject to the burdens imposed by law upon any other citizen, cannot be successfully gainsaid. (*Smith* v. *Northern Pac. Ry. Co.,* 57 Mont. 14, 186 Pac. 684; *Kitto* v. *State,* 98 Neb. 164, L. R. A. 1915F, 587, 152 N. W. 380; *State* v. *Big Sheep,* supra.)

Congress, by Act approved March 1, 1907, Chapter 2285, 34 Stat. 1035, provided "that so soon as all the lands embraced within the Blackfeet Indian reservation shall have been surveyed the Commissioner of Indian Affairs shall cause allotments of the same to be made under the provisions of the allotment laws of the United States to all persons having tribal rights or holding tribal relations and who may rightfully belong on said reservation. That there shall be allotted to each member forty acres of irrigable land and two hundred and eighty acres of additional land valuable only for grazing purposes; * * * ." Money was appropriated for constructing irrigation systems to irrigate the lands, and provisions were made for reimbursement to the government. Provisions were made also concerning the sale of lands within the reservation not allotted to the Indians or reserved by the government for special purposes.

The record discloses that on the 12th of December, 1918, there was issued to defendant a patent in fee for 320.62 acres of land in the Blackfeet Indian reservation. The land was

568

granted to the claimant, "to have and to hold the same, together with all the rights, privileges, immunities and appurtenances of whatsoever nature thereunto belonging unto the said claimant and to the heirs and assigns of the said claimant forever." There are no restrictions in the patent whatsoever except "there is reserved from the lands hereby granted a right of way thereon for ditches or canals constructed by authority of the United States," and except that forty acres of the land were made subject to a lien for the costs and charges due the United States on account of the construction of an irrigation system.

It is apparent that defendant was granted an allotment of the full amount of land authorized by the 1907 Act; and it is evident that the secretary of the interior, being satisfied that defendant was competent and capable of managing his affairs, caused letters patent to issue granting the land to him with no other restrictions than would have been incorporated had the land been granted to a white citizen. However, defendant testified that he did not apply for the patent but it had been issued to him. He did not say he did not accept it. The instrument was placed of record with the county clerk of Teton county, of which Glacier county was then a part, on the 18th of February, 1919. He did not say he did not cause it to be recorded. After patent the land was taxable, and presumably defendant has been paying the taxes levied thereon these ten years.

"The patent was issued by authority and direction of law, and upon general principles, where the patentee does not expressly dissent, his assent and acceptance are to be presumed from the beneficial nature of the grant." (*United States* v. *Schurz,* 102 U. S. 378, 26 L. Ed. 167.) This presumption, fortified by the circumstances shown, satisfies us that defendant accepted the patent. Upon this record nothing said in *United States* v. *Benewah County,* 290 Fed. 628, or *Iyall* v. *Bear,* 130 Wash. 537, 228 Pac. 513, affords defendant any friendly aid.

Now as to the eighty acres of land held in trust for defendant. By Act approved June 30, 1919 (41 Stat. 16), so much of the Act of March 1, 1907, supra, as related to the disposal of surplus unallotted lands within the Blackfeet reservation was repealed and the secretary of the interior was authorized to 'make allotments under existing laws within the reservation to any Indians of the Blackfeet tribe not theretofore allotted,' and thereafter to prorate all unallotted and otherwise unreserved lands among the Indians who had been allotted or might be entitled to rights within the reservation: "Provided, that of the lands so allotted eighty acres of each allotment shall be designated as a homestead by the allottee and be evidenced by a trust patent and shall remain inalienable and non-taxable until Congress shall otherwise direct."

It thus appears that the government granted to the defendant 320 acres of land in fee under the provisions of the Act of March 1, 1907, and the Act of May 8, 1906, thereby emancipating the defendant and giving him the status of a white citizen, and after he had received this patent, the government pursuant to the Act of June 30, 1919, issued to him a trust patent for eighty acres more. Could the government, after having clothed the defendant with the full panoply of citizenship, afterward divest him of some of the rights and privileges thereof, again put him under the supervisory control of guardianship, solely by issuing to him a trust patent? Clearly the answer must be that while the government could place restrictions upon the disposition and taxability of the land it could not thereby place any restrictions upon the defendant's status as a citizen. The defendant, when he received the patent December 12, 1918, became a full citizen of the United States, subject to all of the laws of Montana. He was such when he fired the fatal shot on the evening of October 21, 1926. Notwithstanding that he is of Indian blood, he then stood in the shoes of a white man and is subject to the laws governing a white man in such case. He was no longer a tribal Indian, no longer a ward of the United

States. He was then a citizen of Montana to all intents and purposes, receiving protection from and amenable to the laws of this state. The color line had faded out. (*United States* v. *Hall,* 171 Fed. 214.)

3. Some complaint is made of the instructions. The court ▇ told the jury that any person introducing or attempting to introduce any malt, spirituous or vinous liquors, including beer, ale or wine, or any ardent or intoxicating liquors of any kind into Indian country is guilty of a felony, and laid down the law respecting the right of the defendant as an officer ·to make an arrest without a warrant. What constituted "probable cause" in such case was dealt with in several instructions.

The jury was told that if they found that the defendant was justified in attempting to arrest the decedent "he had a right to use such reasonable force as might be necessary to effect the arrest of the said decedent." Practically the same language was used in another instruction, which was followed by Instruction No. 21, in which the jury was told "that a police officer or other person authorized to make an arrest is not justified in using unnecessary force or resorting to the use of firearms, or other dangerous weapon, to make an arrest where, with diligence and caution, the person sought to be arrested could be otherwise arrested and detained."

No complaint is made of any of these instructions but it .is argued that the court erred in refusing an instruction requested by the defendant defining reasonable force. But 'upon considering the instruction offered we think the jury would not have been much enlightened had it been given. It conveys little if any more meaning than do the words "reasonable force." It is impossible to frame an instruction delimiting the reasonable force which .an officer is permitted to use in making, or attempting to make, an arrest, for he must act in view of the surrounding circumstances and the seriousness of the situation with which he is confronted. We think the instructions in which the phrase is used, taken in con-

nection with Instruction 21, sufficiently advised the jury in respect of that matter.

The jury were advised that if they found from the evidence ▇ that the officers did not have probable cause for believing that the car in which Omer Dillman was riding was carrying intoxicating liquor, then they did not have a right to stop it or to attempt to stop it, and their acts in so doing were unlawful.

In Instruction No. 28 the court advised them that persons lawfully in the country are entitled to use the public highways, and have a right to free passage thereon without interruption or search, and that if Omer Dillman and Elmer Allegree were lawfully upon the public highway, then they were entitled to free passage without interruption or search at the time in question, unless the defendant or his fellow officers, or either of them, had probable cause for believing and did believe that the car in which Dillman and Allegree were riding contained intoxicating liquor, and that they, or either of them, had committed or were then and there committing a felony.

Instruction No. 29, which is criticised by counsel for defendant, is complementary to 28. It told the jury that if neither Dillman nor his companion had committed or were committing a crime, and that the defendant or his fellow officers did not have probable cause for believing that the car in which Dillman and his companion were riding was carrying intoxicating liquor, or that the occupants of said car had committed, or were committing, a crime against the laws of the United States, or of the state of Montana, then there was no duty imposed upon Dillman, or his companion, to stop at the signal or command of the defendant, or his fellow officers. It is argued that Instruction 29 is in conflict with other instructions given which have to do with the right of an officer, acting upon probable cause, to make an arrest without a warrant. We do not think this criticism has any substantial basis. When Instructions 28 and 29 are read to-

gether, and these in connection with the other instructions— as they must be—no substantial conflict appears. Nor does it appear probable that a jury of reasonable men in the light of the entire charge to the jury could have been confused upon this feature of the case.

It may be true that the officers upon the night in question ▆ were in possession of information which would have warranted them in stopping and searching the car of Mc-Curdy, the notorious. But that did not give them the right to stop and search every car that came along the road. The jury did not believe the officers had probable cause to believe that the car driven by Dillman was McCurdy's car, nor that Dillman had committed a felony, and we cannot say the jury erred in its judgment.

We do not see any merit in the other assignments of error. The instructions in some respects were more favorable to the defendant than he had a right to ask, and the entire charge was not unfavorable to him. He has had a fair trial.

The judgment must be and is affirmed.

*Affirmed.*

ASSOCIATE JUSTICES MYERS, MATTHEWS and GALEN concur.

Rehearing denied March 8, 1929.