STATE, Respondent, *v.* PHELPS, Appellant.

(No. 7,037.)

(Submitted January 4, 1933. Decided January 19, 1933.)

[19 Pac. (2d) 319.]

278

*Mr. Guy C. Derry* and *Mr. H. L. Myers,* for Appellant, submitted an original and a reply brief and argued the cause orally.

280

*Mr. L. A. Foot,* Attorney General, *Mr. T. H. MacDonald,* Assistant Attorney General, *Mr. C. C. Guinn,* County Attorney of Big Horn County, and *Mr. E. G. Toomey* and *Mr. Carl McFarland,* the latter two of Counsel on the appeal, submitted an original and a supplemental brief; *Mr. Guinn, Mr. Stanley R. Foot,* Assistant Attorney General, and *Mr. Toomey* argued the cause orally.

281

MR. JUSTICE MATTHEWS delivered the opinion of the court.

Bud Phelps was convicted of the crime of stealing cattle on the Crow Indian Reservation in Big Horn county; he has appealed from the judgment of conviction. It is contended that the defendant is a tribal Indian, residing on the reservation, and consequently the trial court had no jurisdiction to try him.

The history and effect of the paternal position of the government with respect to Indians, declared by treaties and Acts of Congress, are fully covered in *State* v. *Big Sheep*, 75 Mont. 219, 243 Pac. 1067, and need no further exposition. The word "jurisdiction" as used in the ordinance of the convention of Montana, preparatory to its admission as a state, agreeing that Congress was to retain the absolute jurisdiction over Indian lands within the Indian reservations in Montana, "means the power of governing such lands; to legislate for them; the power or right of exercising authority over them," and "for the people who are there, as well as concerning the land itself." (*United States* v. *Partello*, (C. C. 1891) 48 Fed. 670, 676.)

As to individuals committing acts proscribed by both federal and state laws, it is sufficient here to say that, if a tribal Indian commits such a crime off the reservation, or a person not a tribal Indian commits such a crime on the reservation, the state court has jurisdiction; but, if a tribal Indian residing on the reservation commits such a crime on Indian land, the jurisdiction of the federal court is exclusive, even though the Indian has been accorded citizenship. (*United States* v. *Thomas*, 151 U. S. 577, 14 Sup. Ct. Rep. 426, 38 L. Ed. 276; *United States* v. *Sa-Coo-Da-Cot*, (C. C.) Fed. Cas. No. 16,212; *State* v. *Campbell*, 53 Minn. 354, 55 N. W. 553, 21 L. R. A. 169; *State* v. *Monroe*, 83 Mont. 556, 274 Pac. 840; *State* v. *Big Sheep*, supra.)

It is conceded that the crime, if committed, was committed on Indian land. The testimony on which defendant relies to establish his status as an Indian is as follows: "I am

thirty-two years old. * * * My ranch has the name 'The Lone Wolf Ranch'; this land was allotted to me where I live. There is a trust patent issued to this land for me as a member of the Crow Indian tribe, * * * a trust patent made under government restrictions; that land is all on the Indian reservation. I am a member of the Crow Indian tribe; I receive annuities and have tribal rights; * * * my allotment consists of one thousand acres." This testimony was unchallenged; the defendant was not even cross-examined as to his statements.

The defendant's father and mother were called to the stand, but neither was questioned as to ancestry; the only pertinent statement brought out was that they reside on the reservation, where the father has lived for the past "thirty-four or thirty-five years."

As the parents have resided on the reservation, in Big Horn county, since before defendant's birth, and he testified that he has resided in that county all his life, it is reasonable to presume that he was born and raised on the reservation.

The name "Indian" was given to the inhabitants of this continent, on its discovery by Columbus, under the erroneous supposition that the new land was part of India (*People* v. *Hall*, 4 Cal. 399), and it is with reference to the descendants of the aborigines that the term is used in the federal statutes here controlling (*Frazee* v. *Spokane County*, 29 Wash. 278, 69 Pac. 779) ; they do not include white men adopted into the tribes at a mature age, but only those persons who, by the usages and customs of the Indians, are regarded as belonging to their race. (*United States* v. *Rogers*, 4 How. (45 U. S.) 567, 11 L. Ed. 1105; *United States* v. *Rogers*, 27 Fed. Cas. 886, No. 16,187; *Ex parte Morgan*, (D. C.) 20 Fed. 298; *Stiff* v. *McLaughlin*, 19 Mont. 300, 48 Pac. 232.)

For the purpose of enforcing certain Acts of Congress, it is held that the "child follows the condition of the father," and therefore the child of an Indian woman by a man not an Indian is not an Indian (*United States* v. *Ward*, (C. C.) 42 Fed. 320; *Smith* v. *Bonifer*, (C. C.) 154 Fed. 883; *United*

*States* v. *Hadley*, (C. C.) 99 Fed. 437, 439), and, where such a child is born off the reservation and goes to live on the reservation with his mother some years thereafter, he is not classed as an Indian so as to exempt his property from taxation (*United States* v. *Higgins*, (C. C., District of Montana) 110 Fed. 609).

However, much depends upon the statute considered, and cases holding that the child of an Indian woman follows the condition of the mother seem to be as numerous as those declaring the above rule. (*United States* v. *Sander*, 27 Fed. Cas. 950, No. 16,220; *Alberty* v. *United States*, 162 U. S. 499, 16 Sup. Ct. Rep. 864, 40 L. Ed. 1051; *Waldron* v. *United States*, (C. C.) 143 Fed. 413; *New York Indians* v. *United States*, 40 Ct. of Cl. 448.) This is the rule with reference to the punishment of crimes committed in the Indian Territory (*United States* v. *Sander*, 27 Fed. Cas. 950, No. 16,220), and Congress has declared that all children born of a marriage solemnized between a white man and an Indian woman by blood, and not by adoption, where such a woman is, or, at the time of her death, was, recognized by the tribe, shall have the same rights and privileges to the property of the tribe to which the mother belongs, or belonged at the time of her death, as any other member of the tribe. (30 Stats. at Large, 90, sec. 1 (25 U. S. C. A., sec. 184).)

The rights and privileges of the members of the tribe, with reference to the property of the tribe, are principally to receive annuities and rations and the allotment of that portion of the Indian lands to which, as a ward of the government, each Indian member of the tribe is entitled.

Presumptively, a person apparently of mixed blood, residing upon a reservation and claiming to be an Indian, is in fact an Indian. (20 Op. Attys. Gen. 711, 742.)

Since 1875 all "Indians" entitled to receive supplies must be enrolled by the agent of the government in charge of the reservation (18 Stat. 449, sec. 4 [25 U. S. C. A., sec. 133]); so that the fact that a person is receiving annuities demonstrates that he is an enrolled member of the tribe to

which money or supplies may be distributed. Since 1899 all "Indians" entitled to annuity money are authorized to receive and receipt for the same after reaching the age of eighteen years (30 Stat. 947, sec. 8 [25 U. S. C. A., sec. 116]), and, for the purpose of inducing such "Indians" to become self-supporting, all male Indians between the ages of eighteen and forty-five years may be required to perform labor for themselves or the tribe to the amount of the payment or equal to the value of the supplies (18 Stat. 449, sec. 3 [25 U. S. C. A., sec. 137]), and payment may be withheld from an "Indian" under the influence of liquor.

That the law respecting annuities applies only to the descendants of the aborigines, but contemplates the inclusion of those of mixed blood, is demonstrated by the Act of Congress of June 30, 1919, which provides that the "final roll" required to be made of each Indian tribe shall show the age and "*quantum* of Indian blood" of each member of the tribe entitled to receive from the tribal funds. (Sec. 1 (25 U. S. C. A., sec. 163).)

The provisions for annuities and allotments of Indian lands to members of the Crow tribe are found in the Act of Congress April 11, 1882 (22 Stat. 42), ratifying the agreement of the Indians submitted in 1880 (see 1 "Indian Affairs," 195). On June 4, 1920, Congress made provision for the final enrollment of the Crow tribe, and provided for the striking from the roll, within one year, of all names found to have been fraudulently placed thereon. (41 Stat. 751, amended 44 Stat. 658.) The roll of the tribe was therefore complete and permanent long before the filing of the information herein, and fixed the right of any member of the tribe to receive allotment of land within the reservation.

Any Indian to whom an allotment of land has been made, and while the same shall be held by the government in trust, even though not under the control or immediate personal supervision of an Indian agent, and though he may have been made a citizen of the United States and of the state in which he resides, is still an "Indian" within the meaning of federal

Acts relating to crime. (*United States* v. *Flynn*, Fed. Cas. No. 15,124; *Hallowell* v. *United States*, 221 U. S. 317, 31 Sup. Ct. Rep. 587, 55 L. Ed. 750; *United States* v. *Kiya*, (D. C.) 126 Fed. 879; *United States* v. *Celestine*, 215 U. S. 278, 30 Sup. Ct. Rep. 93, 54 L. Ed. 195; *United States* v. *Sutton*, 215 U. S. 291, 30 Sup. Ct. Rep. 116, 54 L. Ed. 200.)

Allotments of lands by trust patent containing restrictions against alienation and the like are made only to "Indians" entitled to receive rations and annuities from the government, and "until the issuance of fee-simple patents all allottees to whom trust patents shall be issued shall be subject to the exclusive jurisdiction of the United States." (Act of Feb. 8, 1887, 24 Stats. at Large, 390, Chap. 119, sec. 6, Act of May 8, 1906, 34 Stats. at Large, 182, Chap. 2348 (25 U. S. C. A., sec. 349.) Those of mixed blood, residing on the reservation and maintaining tribal relations, are "Indians" entitled to these allotments (*Sully* v. *United States*, (C. C.) 195 Fed. 113; *United States* v. *Gardner*, (D. C.) 189 Fed. 690), but, in the absence of a special enactment so providing, or by tribal laws, while Indian nations were accorded local self-government, a white man married to an Indian woman, residing on a reservation and made a member of the tribe or nation, is not entitled to share in tribal funds or in the allotment of Indian lands. (*Red Bird* v. *United States*, 203 U. S. 76, 27 Sup. Ct. Rep. 29, 51 L. Ed. 96.)

It is clearly shown, on consideration of the above applicable ▮ laws, that the defendant is an enrolled member of the Crow Indian tribe, has resided on the reservation all his life, and has been recognized by the tribe and by the government authorities as of the Indian race and granted annuities and the allotment of Indian lands, and is therefore in fact an "Indian," and that, as an "allottee," he is subject to the exclusive jurisdiction of the United States until the issuance of a fee-simple patent for his land.

Three objections are raised to this conclusion: First, that ▮▮ defendant may have taken by inheritance rather than in his own right; second, that he may have been erroneously

enrolled and granted tribal rights; and, third, that he may hold other lands to which fee-simple patent has issued and is therefore emancipated.

As defendant's father and mother are still living, it would be a violent and unwarranted presumption to say that the positive declaration of Congress that, as an allottee, he is subject to the exclusive jurisdiction of the United States, is to be set at naught because he might in some manner have taken his allotment by inheritance. As to descent of right to allotment, see 26 Stats. at Large, 795, Chap. 383, sec. 5 (25 U. S. C. A., sec. 371).

As to the second objection, we must presume that official duty has been regularly performed (sec. 10606, subd. 15, Rev. Codes 1921).

With reference to the final objection, it is held in *State* v. *Monroe,* supra, that, where an Indian is emancipated by receiving fee-simple patent to his allotted land, the subsequent allotment to him of land on division of additional Indian land cannot restore him to the condition of a ward of the government, but no such condition could be assumed to exist here.

Under the special Act of June 4, 1920, above, provision is made for disposition of the Crow lands, by first issuing trust patents for the amount of land each Indian is entitled to and the prorating of all excess land on the reservation. Owing to the great extent of the reservation as compared with the membership of the tribe (see Ann. Rep. Comm. Ind. Affairs, June 30, 1932), there is nothing strange in the fact that Phelps held 1,000 acres of allotted land; the above Act requires each member of the tribe to designate 640 acres, allotted or to be allotted, as a homestead; but it is not reasonable to assume that, having received fee-simple patent to his allotted land, Phelps should have received a further allotment of 1,000 acres of surplus land.

It is clear from the statutes and decisions cited that the law ▮▮▮ intends that only "Indians" shall receive annuities and the allotment of tribal lands, and that an allottee remains a ward of the government until a fee-simple patent is issued

for his allotted land; further, that, if such a ward of the government commits a crime, triable in the federal court, upon tribal lands within a reservation, whether such lands have been allotted or not, the federal court has exclusive jurisdiction. (*State* v. *Monroe,* supra, and cases cited.)

It would seem that the right to receive an allotment may depend upon Indian ancestry without regard to the place of birth, so that a child, shown to have been born off the reservation to an Indian woman who has severed tribal relations and married a white man, may receive an allotment on return to the reservation and tribe, but, being thus born to United States citizenship, the act of the government agents in making the allotment cannot "deprive him of his birthright," and consequently cannot deprive the state court of jurisdiction. (*United States* v. *Hadley,* supra; *United States* v. *Logan,* (C. C.) 105 Fed. 240.) On the other hand, as indicated by the cited cases, jurisdiction depends further upon the person under investigation being born a member of the tribe.

Herein the testimony of the defendant, in effect showing that he is a member of the tribe, born on the reservation, and receiving annuities and holding allotted land, as only an Indian lawfully can, constituted a prima facie showing that the state court was without jurisdiction of his person, which showing the state made no attempt to controvert. On the uncontradicted evidence, therefore, we are compelled to hold that the judgment entered is a nullity and must be reversed.

The judgment is reversed and the cause remanded to the district court of Big Horn county, with direction to dismiss the information.

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES ANGSTMAN, STEWART and ANDERSON concur.

Rehearing denied February 16, 1933.