## KING v. McANDREWS et al.

(Circuit Court, D. South Dakota, S. D. November 3, 1900.)

1. PUBLIC LANDS—PATENTS AS EVIDENCE OF TITLE.

The issuing of a patent for public lands being a ministerial act, the validity of a patent depends on the legal authority of the department to issue it; and one issued under the homestead law, which shows upon its face, in connection with legislation of which the court is required to take judicial notice, that the land embraced therein had been previously appropriated and was not subject to entry under such law, is void, and is not admissible in evidence to establish title.

2. SAME—INCORPORATION INTO CITY—LANDS WITHIN INDIAN RESERVATION.

Act Dak. T. March 7, 1885, amending the previous act incorporating the city of Chamberlain by extending the corporate limits of the city, not having been disapproved by congress, was valid, notwithstanding the fact that a portion of the land so included in the city was, at the time within the limits of the Great Sioux Indian reservation, since the land was within the jurisdiction of the territorial legislature, and the act in no manner affected the title, or the rights or property of the Indians therein; and on the extinguishment of the Indian title, if not before, such act, which was continued in force with the other laws of the territory after South Dakota was admitted as a state, became operative as to the lands previously within the reservation.

3. SAME—HOMESTEAD ENTRIES—LANDS WITHIN LIMITS OF CITY OR TOWN.

Act March 3, 1891, repealing the pre-emption law (26 Stat. 1095), did not have the effect of extending the right of homestead entry to lands included within the limits of an incorporated city or town, although it repealed Rev. St. U. S. § 2258, which expressly excepted such lands from those subject to pre-emption, and also by reference in the homestead law from homestead entry, since such lands are not "unappropriated," within the

meaning of Rev. St. U. S. § 2289, as amended by said act, which authorizes homestead entries only on "unappropriated public lands."

**4. SAME.**

Rev. St. U. S. § 2258, by expressly exempting from pre-emption entry lands included within the limits of a city or town, clearly authorized states and territories to incorporate public lands within the limits of a city or town; and the territorial legislature of Dakota, by Act of March 7, 1885, while said section was in force, incorporated within the limits of the city of Chamberlain certain lands then included in the Great Sioux Indian reservation, which act was continued in force by the state. Act Cong. March 2, 1889 (25 Stat. 888), extinguished the Indian title to a portion of the reservation, including such lands, and provided that on proclamation of the president it should be subject to disposition under the homestead law, and "under the law relating to town sites." *Held*, that the effect of the action of the territory was to appropriate the lands incorporated into the city to city or town-site purposes, and that on their restoration to the public domain they did not become subject to homestead entry as "unappropriated public lands."

On Motion for New Trial.

S. H. Wright, for plaintiff.
John D. Rivers, for defendants.

CARLAND, District Judge. This is an action of ejectment brought by plaintiff against defendants to recover possession of lots 3 and 4, and the S. E. ¼ of the S. W. ¼ of section 10, all in township 104, range 71 W., Brule county, S. D. The case was tried at the present term of the court, and a verdict directed for defendants. On the trial the plaintiff, to establish his title to the demanded premises, offered in evidence a patent from the United States dated July 26, 1899, conveying lots Nos. 3 and 4, and the S. E. ¼ of the S. W. ¼ of section 10, and lot No. 1 of section 15, in township 104 N., of range 71 W., Brule county, S. D., containing 112 acres and $^{30}/_{100}$ of an acre, to one Henry J. King, plaintiff's grantor. The offer of the patent in evidence was objected to by counsel for defendants for the reason that said patent was void on its face. The court sustained the objection, and excluded the patent from evidence. This ruling of the court is alleged to be erroneous, and because thereof a new trial is asked. It was not claimed by counsel for defendants at the trial that the patent, by reason of its recitals alone, was null and void, but that, taken in connection with matters concerning which the court would take judicial notice, it conclusively appeared that the land department had no power to issue the same. In Burfenning v. Railroad Co., 163 U. S. 323, 16 Sup. Ct. 1018, 41 L. Ed. 175, the supreme court said:

"But it is also equally true that when, by act of congress, a tract of land has been reserved from homestead and pre-emption, or dedicated to any special purpose, proceedings in the land department in defiance of such reservation or dedication, although culminating in a patent, transfer no title, and may be challenged in an action at law. In other words, the action of the land department cannot override the expressed will of congress, or convey away public lands in disregard or defiance thereof."

Smelting Co. v. Kemp, 104 U. S. 636, 26 L. Ed. 875; Wright v. Roseberry, 121 U. S. 488, 519, 7 Sup. Ct. 985, 30 L. Ed. 1039; Doolan v. Carr, 125 U. S. 618, 8 Sup. Ct. 1228, 31 L. Ed. 844; Davis' Adm'r v.

Weibbold, 139 U. S. 507, 11 Sup. Ct. 628, 35 L. Ed. 238; Knight v. Land Ass'n, 142 U. S. 161, 12 Sup. Ct. 258, 35 L. Ed. 974; In re Moore, 27 Land Dec. Dep. Int. 488.

In Morton v. Nebraska, 21 Wall. 660, 22 L. Ed. 639, the supreme court said:

"It does not strengthen the case of the plaintiffs that they obtained certificates of entry, and that patents were subsequently issued on these certificates. It has been repeatedly decided by this court that patents for lands which have been previously granted, reserved from sale, or appropriated are void. The executive officers have no authority to issue a patent for the lands in controversy, because they were not subject to entry, having been previously reserved, and this want of power may be proved by defendant in an action at law."

The issuing of a patent for public lands is a ministerial act, which must be performed according to law, and, when issued upon appropriated lands, is without authority of law and void. Deweese v. Reinhard, 165 U. S. 386, 17 Sup. Ct. 340, 41 L. Ed. 757; U. S. v. Stone, 2 Wall. 525, 17 L. Ed. 765; Riley v. Welles, 154 U. S. 578, 14 Sup. Ct. 1166, 19 L. Ed. 648; U. S. v. Carpenter, 111 U. S. 347, 4 Sup. Ct. 435, 28 L. Ed. 451; Chotard v. Pope, 12 Wheat. 586, 6 L. Ed. 737; Railroad Co. v. Colburn, 164 U. S. 383, 17 Sup. Ct. 98, 41 L. Ed. 479; Railway Co. v. Forsythe, 159 U. S. 46, 15 Sup. Ct. 1020, 40 L. Ed. 71.

Section 1 of the act to incorporate the city of Chamberlain, in the county of Brule, S. D., passed by the legislative assembly of the territory of Dakota in 1883, is as follows:

"Section 1. That all that part of the county of Brule in the territory of Dakota described as follows, to wit: Beginning at a point where American creek empties into the Missouri river, thence easterly along the various courses of said American creek to the quarter section line in section 15, township 104, range 71, thence south on said line to the quarter corner between sections 15 and 22, thence in a westerly direction on said line between said sections 15 and 22, and also between sections 16 and 21, 64 chains and 78 links, thence south 20 chains, thence west to the Missouri river, and thence northeasterly along the various courses of said river to the place of beginning, is declared to be a city, and the inhabitants thereof are constituted a body corporate and politic with perpetual succession under the name of the city of Chamberlain, and by that name shall have power to sue and be sued, to make all contracts necessary to the exercise of its corporate power, to purchase, hold, lease, transfer and convey real and personal property for the use of said city, to have and use a corporate seal and change the same at pleasure, and to exercise all the rights and privileges pertaining to a municipal corporation."

Section 1 of "An act to amend an act entitled 'An act to incorporate the city of Chamberlain,'" passed by the legislative assembly of the territory of Dakota on March 7, 1885, is as follows:

"Section 1. That section 1 of said act be and the same is hereby amended as follows: That the corporate limits of said city of Chamberlain be and the same are hereby extended to embrace and include within the limits of said city of Chamberlain, all of section number 15, also the south half of section number 10, all in township 104 north of range 71."

The land in question is a portion of the land described in the patent to King, and is also included in the description of land contained in the act of March 7, 1885. Up to this point it appears that the land described in the patent is within the corporate limits of

the city of Chamberlain, and it is claimed by counsel for defendants that for this reason the land department had no authority to entertain a homestead entry which resulted in the patent, and no authority to issue the patent. The land department, proceeding on the theory that, if the land described in the patent was within the corporate limits of the city of Chamberlain, the entry which resulted in the patent should be canceled, decided that the act of the legislative assembly of the territory of Dakota dated March 7, 1885, was null and void, for the reason that the land described by the act was at the date of its passage within the exterior boundaries of the Great Sioux Indian reservation. City of Chamberlain v. King, 24 Land Dec. Dep. Int. 526. The patent, so far as its admission in evidence on the trial is concerned, must stand or fall upon the recitals contained therein, and those matters of which the court will take judicial notice. The court, from the act of congress of March 2, 1889 (25 Stat. 888), and the proclamations of the president of the United States dated February 10, 1890, and December 5, 1894, will take judicial notice that the land in controversy was on March 7, 1885, within the exterior boundaries of the Great Sioux Indian reservation. It also appears from the act of congress and the proclamations of the president of the United States hereinbefore mentioned that a large portion of the Great Sioux Indian reservation, including the lands in question, was on the 10th day of February, 1890, restored to the public domain, so far as the Indians were concerned. It also appears from the proclamation of the president of the United States dated December 5, 1894, that a particular tract of land, including the land in controversy, was not restored to the public domain until April 15, 1895, at which time it is conceded that King made homestead entry at the local land office at Chamberlain, S. D., for the land for which he received patent. It appears from the act of congress of March 2, 1889, and the proclamations hereinbefore mentioned, that the Chicago, Milwaukee & St. Paul Railway Company, by an agreement with the Sioux Indians, had the right to perfect title to a tract of country including the lands in question, after the Indian title had been extinguished by the proclamation of February 10, 1890, and that said railroad company having failed to perform the conditions upon which it should have title to the tract of land described in the proclamation of December 5, 1894, the same was by said proclamation restored to public domain. It thus appears that the proceedings which resulted in the patent to King for the land in question were initiated long after the act of March 7, 1885, amending the act incorporating the city of Chamberlain. Assuming for the present that, during the time between the entry at the local land office and the issuance of the patent to King for the land in question, lands within the limits of an incorporated town were not subject to entry, was the act of March 7, 1885, void and inoperative by reason of the fact that the land described therein was within the boundaries and a part of the Great Sioux Reservation? The land department held that the act was void. What authority the land department possesses to annul the act of the state or territorial legislature is not apparent. It has generally been supposed

104 F.—28

that that power either rested in congress or the courts. Section 6 of the act to provide a temporary government for the territory of Dakota, approved March 2, 1861, provided "that the legislative power of the territory shall extend to all rightful subjects of legislation consistent with the constitution of the United States and the provisions of this act, but no law shall be passed interfering with the primary disposal of the soil." Neither this act, the treaty with the Sioux Indians concluded April 29, 1868 (15 Stat. 635), nor any law or treaty, contains any provision that lands within the limits of the Great Sioux Reservation shall be excluded from territorial or state jurisdiction. This being so, lands within the said reservation were a part of Dakota territory, and subject to the jurisdiction thereof. Langford v. Monteith, 102 U. S. 145, 26 L. Ed. 53. In the case of Railway Co. v. Fisher, 116 U. S. 28, 6 Sup. Ct. 246, 29 L. Ed. 542, it appears that the railroad company had built and was operating in Idaho a railroad which, for a distance of 69 miles and a fraction of a mile, passed through a tract of land in the county of Oneida known as the "Ft. Hill Indian Reservation," which was on the 30th day of July, 1869, set apart by order of the president, for the Bannock tribe of Indians, pursuant to the provisions of a treaty between the United States and the Eastern band of Shoshones and the Bannock tribe, concluded July 3, 1868. The territory of Idaho levied taxes to the amount of $4,478 upon the property of this road within the Indian reservation, and, the tax collector of the county having commenced proceedings to enforce the tax by sale of the property of the company, a suit was commenced to restrain him from so doing. The stipulations in the act of March 3, 1863, organizing the territory of Idaho, so far as Indians are concerned, are the same as those in the act creating the territory of Dakota, and the treaty setting apart the reservation contains similar provisions to those of the treaty of 1868 between the United States and the Sioux Indians. The supreme court, in disposing of the case, and holding that the territory of Idaho had jurisdiction over the Indian reservation, spoke as follows:

"It is contended by the plaintiff that these stipulations cannot be carried out if the laws of the territory are enforced on the reservation; and in support of the position special emphasis is placed upon the clause in regard to persons passing over, settling upon, or residing in the territory, and the clause touching wrongdoers among the Indians. As these treaty provisions have the force and effect of a law, it is insisted that the reservation is excluded from the general jurisdiction of the territory as effectually as if the exclusion was made in specific terms. To uphold that jurisdiction in all cases and to the fullest extent would undoubtedly interfere with the enforcement of the treaty stipulations, and might thus defeat provisions designed for the security of the Indians. But it is not necessary to insist upon such general jurisdiction for the Indians to enjoy the full benefit of the stipulations for their protection. The authority of the territory may rightfully extend to all matters not interfering with that protection. It has therefore been held that process of its courts may run into an Indian reservation of this kind, where the subject-matter or controversy is otherwise within their cognizance."

In the case of Draper v. U. S., 164 U. S. 240, 17 Sup. Ct. 107, 41 L. Ed. 419, the supreme court held that, under and by virtue of the enabling act which admitted Montana and South Dakota to the

Union, there was no exclusion of jurisdiction from Indian reservations in favor of the United States, and that the state courts were vested with jurisdiction to try and punish all crimes other than those committed by Indians or against Indians. The title of the land which the act of March 7, 1885, brought within the limits of the city of Chamberlain, was in the United States, and the Indians only had the right of occupancy, and the inclusion of a few acres within the limits of the city of Chamberlain in no way interfered with the rights or property of the Indians; and it nowhere appears that the Indians or congress ever objected to the act of March 7, 1885.

Section 1844, Rev. St. U. S., which was a part of the organic act of Dakota territory, provided:

"The secretary [of the territory] shall record and preserve all the laws and proceedings of the legislative assembly, and all the acts and proceedings of the governor in the executive department. He shall transmit one copy of the laws and journals of the legislative assembly within thirty days after the end of each session thereof, to the president."

And we must presume that this duty was performed, and that within 30 days after the end of the session at which the law of March 7, 1885, was passed the president of the United States was furnished with a copy of the same. Congress had the power to annul it, but did not do so. As to the power to include a portion of the Indian reservation within the corporate limits, see State v. Doxtater, 47 Wis. 278, 2 N. W. 439; also, Schriber v. Town of Langlade, 66 Wis. 616, 29 N. W. 547, 554.

The act of March 7, 1885, being clearly within the legislative power of the territory of Dakota, was a valid act; and, although it might not operate to the destruction of any treaty rights of the Indians, still, for the purpose of bringing the land in question within the corporate limits of the city of Chamberlain, it had full operation. Let us concede that from the time of its passage until the extinguishment of the Indian title on February 10, 1890, the act of March 7, 1885, was not operative. Certainly on the extinguishment of the Indian right of occupancy it became operative as to the land in question, as the legislature of the territory of Dakota had the right to incorporate within the limits of a city lands of the United States or of any private citizen. On November 2, 1889, the state of South Dakota was admitted to the Union, and by an act of the legislature of the state of South Dakota approved February 6, 1890 (Sess. Laws 1890, p. 254), it is provided:

"All laws in force in the territory of Dakota at the date of the admission of the state of South Dakota into the Union, not repugnant to or inconsistent with the constitution of said state, shall continue and be in full force and effect until altered, amended or repealed."

The law of March 7, 1885, by virtue of this state legislation, became a valid law of the state of South Dakota, as it was in no wise in conflict with or repugnant to the constitution of the state of South Dakota. On July 30, 1886, congress passed an act prohibiting the legislatures of the territories of the United States from passing special laws incorporating cities, towns, or villages, or

changing or amending the charter of any town, city, or village; but this act was passed subsequent to the act of March 7, 1885, and only spoke for the future, and in no wise invalidated acts of special legislation passed before that date. The constitution of the state of South Dakota also has a similar provision, but it only had relation to the future acts of the legislative assembly of the state of South Dakota, and to incorporate a city or to amend a charter incorporating a city is not in conflict with or repugnant to anything in the constitution; and the mere fact that the manner of passing the territorial act of March 7, 1885, would not be allowable under the constitution would not have the effect to repeal the law, especially when taken in connection with article 26 of the same constitution, section 1 of which provides:

"That no inconvenience may arise from the change of the territorial government to the permanent state government, it is hereby declared that all rights, actions, prosecutions, claims and rights of individuals and all bodies corporate, shall continue as if no change had taken place in this government."

At the time of the admission of the state of South Dakota there were many cities within its boundaries which had been incorporated by special acts, and it has never been contended for a moment that the admission of the state repealed the charters of all these towns and cities. Thus we have, at the time King initiated his proceedings which resulted in the patent offered in evidence, a valid law incorporating the land in question within the city limits of the city of Chamberlain. If there is any law withdrawing land within the limits of an incorporated town from homestead entry, it is difficult to see why this patent is not void on its face, when taken in connection with matters of which this court must take judicial notice.

While the land department, in issuing the patent to King, assumed that if the act of March 7, 1885, was valid, the entry ought to be canceled, counsel for plaintiff now insists that since the act of March 3, 1891 (26 Stat. 1095), there has been no law prohibiting homestead entries upon land included within the limits of an incorporated city or town. The argument in support of this position is as follows:

Section 2258, Rev. St. U. S., the same having been taken from the act of congress dated September 4, 1841 (5 Stat. 455), is as follows:

"The following classes of lands, unless otherwise specially provided for by law, shall not be subject to the rights of pre-emption, to wit: First, lands included in any reservation by any treaty, law or proclamation of the president for any purpose; second, lands included within the limits of any incorporated town or selected as the site of a city or town; third, lands actually settled and occupied for purposes of trade and business and not for agriculture; fourth, lands on which are situated any known salines or mines."

Section 2289, Rev. St. U. S., previous to the act of March 3, 1891, above mentioned, read as follows:

"Every person who is the head of a family, or who has arrived at the age of 21 years and is a citizen of the United States, or who has filed his declaration to become such as required by the naturalization laws, shall be entitled to enter one quarter section or less quantity, of unappropriated public lands upon which such person may have filed a pre-emption claim, or which may, at the time the application is made, be subject to pre-emption, at $1.25 per acre."

By section 4 of the act of March 3, 1891, the sections of the Revised Statutes from 2257 to 2288, inclusive, were repealed; and by section 5 of the act of March 3, 1891, section 2289, above mentioned, is amended so as to read as follows:

"Every person who is the head of a family, or who has arrived at the age of 21 years and is a citizen of the United States, or who has filed his declaration of intention to become such, as required by the naturalization laws, shall be entitled to enter one quarter section or a less quantity, of unappropriated public lands to be located in a body, in conformity to the legal subdivisions of the public lands, but no person who is the proprietor of more than 160 acres of land in any state or territory, shall acquire any right under the homestead law. And every person owning and residing on land, may, under the provisions of this section, enter other land lying contiguous to his land, which shall not, with the land so already owned and occupied, exceed in the aggregate 160 acres."

It will be noticed that the amendment to section 2289 eliminates from the same the following words:

"Upon which such person may have filed a pre-emption claim, or which may, at the time application is made, be subject to pre-emption."

Under section 2289 as it stood before the act of March 3, 1891, a homestead entry could not be made upon land that was not subject to pre-emption, and it thus happened that the provision of section 2258 of the pre-emption law determined what land was exempt from homestead as well as pre-emption filing. The act of March 3, 1891, was an act which repealed the pre-emption and timber culture laws. Congress having by this act repealed the pre-emption law, it was necessary to amend section 2289, for the reason that the reference to pre-emption in that section would be meaningless if there was no pre-emption law; but it does not necessarily follow that, because congress amended section 2289 as stated, all lands described in section 2258 are now subject to homestead entry. Section 2289, since its amendment, allows homestead entries to be made upon unappropriated public lands. The uniform interpretation of section 2289 by the land department since this amendment has been to the effect that homestead entries could not be made upon lands included within the corporate limits of a town. In Barbour v. Wilson, 23 Land Dec. Dep. Int. 466, decided December 3, 1896, the honorable secretary of the interior used the following language:

"I do not think it follows from said amendment, however, that lands within the limits of an incorporated town may now be entered under the homestead law. I cannot believe that such was the intention of congress. It might just as well be contended that lands on which are situated known salines or mines —certainly the former—are subject to homestead entry under the amended law, for the reason that such lands embraced one of the exceptions in the repealed pre-emption law, and no reference thereto is contained in the amended homestead law. The purpose of congress in making the amendment is apparent, and I do not think a broader scope should be given the amended law than that purpose warrants. Moreover, as the law now stands, it is only 'unappropriated lands' that are subject to homestead entry, and I do not think that lands included within the limits of an incorporated town can be justly held to come within that category. It would not be in accord with a sound public policy to allow the acquisition by homestead entry of lands so situated, and thereby likely largely enhanced in value. Moreover, the settlement and occupancy of such lands for purposes of trade and business, or their use for town-

site purposes, could and most likely would be seriously interfered with if such were the law."

This court will take judicial notice of the rules and regulations of the land department of the United States in regard to the disposal of the public lands. Caha v. U. S., 152 U. S. 211, 14 Sup. Ct. 513, 38 L. Ed. 415. And it appears from said rules and regulations that before and continuously since the act of March 3, 1891, it is required of the homestead claimant and his witnesses, when he makes final proof at the local land office, that he answer under oath the following questions:

"Question. Is your present claim within the limits of an incorporated town or selected site of a city or town, or used in any way for trade and business? Question. Are there any indications of coal, salines, or minerals of any kind on the land?"

Why are answers to these questions required, if they are immaterial?

The interpretation given to laws regulating the disposal of the public lands by the land department, which is vested with the disposal of the same under said laws, is entitled to great respect. Sturr v. Beck, 133 U. S. 541, 10 Sup. Ct. 350, 33 L. Ed. 761. It is certainly the understanding of the land department, so far as matters of which judicial notice can be taken is concerned, that land included within the limits of an incorporated town is not subject to entry under the homestead laws. But, speaking of the particular case before the court, let us see if, at the time King made his entry upon the land in question, it was unappropriated public lands. Section 2258 was certainly in force until March 3, 1891. By its terms homestead and pre-emption claims could not be filed upon land within the incorporated limits of a town. This certainly was a permission by congress to the states and territories that public lands might be incorporated within the corporate limits of a city or town. While this law was in force the act of March 7, 1885, was passed, incorporating the land in question within the limits of the city of Chamberlain. That law, as has hereinbefore been stated, was valid. It was ratified and affirmed by the legislative power of the state of South Dakota, and the land in question had been absolutely appropriated by being brought within the limits of the city of Chamberlain. "To appropriate," in the sense that the word is used in the land laws of the United States, is to select the land for a particular purpose. By including the land in question within the corporate limits of the city of Chamberlain, the title to the land was in no wise interfered with; but the legislative power, in its discretion and judgment, thought it was proper that it be brought within the corporate limits. Courts have no authority to review the reasons for legislative action in this particular, and the act of the legislature had no other force or effect than to appropriate this land for townsite purposes, leaving the United States to dispose of it in any way that it should deem proper. The act of June 14, 1878, allowing timber culture entries on the public land, contained no express prohibition against entry of land included within the limits of a city or town; but the land department, in Re Dayton, 2 Land Dec. Dep.

Int. 634, held the act must be construed in the light of the general laws regulating the disposal of the public lands, and rejected Dayton's application for a timber culture entry within the limits of the city of Aberdeen, Brown county, Dak. T. By section 21 of the act of March 2, 1889 (25 Stat. 888), dividing the Great Sioux Reservation into separate reservations, it is provided that "all lands in the Great Sioux Reservation, outside of the separate reservations, shall be disposed of by the United States to actual settlers only, under the provisions of the homestead law, and under the law relating to town sites." This provision in no wise interferes with the provision of the general law that a homestead entry can only be made upon unappropriated public lands. By section 16 of the same act, congress recognized certain agreements which the Chicago, Milwaukee & St. Paul Railway Company and Dakota Central Railway Company had made with the Sioux Indians, and the railroads were given a certain time within which to comply with certain conditions, and in default thereof the lands should be forfeited. The description of these particular lands does not appear in the act of March 2, 1889, but in the proclamation of the president of the United States of December 5, 1894 (19 Land Dec. Dep. Int. 431), the description of these lands that were referred to in section 16 is given; and it appears from said description that the land in question in this suit is a portion of the land referred to in section 16, and section 16 contains this provision:

"And the said railway companies, and each of them, shall, within three years after this act takes effect, construct, complete, and put in operation their said lines of road; and in case the said lines of road are not definitely located and maps of location filed within the periods hereinbefore provided, or in case the said lines of road are not constructed, completed and put in operation within the time herein provided, then and in either case, the lands granted for right of way, station grounds, or other railway purposes, as in this act provided, shall without any further act or ceremony, be declared by proclamation of the president forfeited, and shall, without entry or further action on the part of the United States, revert to the United States and be subject to entry under the other provisions of this act."

This provision and the other provisions of section 16 account for the fact that the lands in question were not open to settlement until April 15, 1895; but there is nothing in the act of March 2, 1889, which would in any way interfere with the act of the legislative assembly of Dakota territory of March 7, 1885. At the time the act of March 2, 1889, was passed, section 2258, Rev. St. U. S., exempting lands within the incorporated limits of a city or town from homestead entry, was in force; and when congress said in the act of March 2, 1889, that lands open to settlement by that act should be disposed of by the United States to actual settlers under the provisions of the homestead law, it did not intend to repeal section 2258, which exempted land within the limits of a city or town from homestead entry. It merely provided that the lands should be disposed of under the homestead laws, leaving the homestead laws, as they then existed, to operate. The land in question is a portion of 188 acres on the east bank of the Missouri river, to the north of the city of Chamberlain, which is referred to in the proclamation of

the president of the United States dated December 5, 1894. The balance of the tract reserved to the railway company, and also open to settlement by said proclamation, consisted of 640 acres on the west bank of the Missouri river; and the fact that congress dealt with these lands in the act of March 2, 1889, and that the president issued his proclamation of December 5, 1894, concerning the same, without saying anything about this tract within the corporate limits of the city of Chamberlain, is no reason for saying that congress had intentionally, or even by implication, annulled the act of the territorial legislature incorporating this land within the limits of the city of Chamberlain. I cannot conclude otherwise than that the land in question, prior to the entry of King which resulted in the patent offered in evidence, was lawfully appropriated, within the meaning of the homestead laws, and that therefore no homestead entry could be made thereon; and this all appears to the court from documents of which the court is bound to take judicial notice. I therefore am of the opinion that the patent was rightly excluded, and that the motion for a new trial should be denied.