STATE of North Dakota, Plaintiff,

v.

Leonard LOHNES, Defendant.

Cr. 264.

Supreme Court of North Dakota.

Feb. 18, 1955.

Paul Benson, Atty. Gen., and Honorable Melvin Christianson, State's Atty., Minnewaukan, for plaintiff.

John B. Hart, Rolla, for defendant.

Clyde Duffy, Devils Lake, amicus curiae.

GRIMSON, Judge.

This matter comes before us on a certified question under Chapter 32–24, NDRC 1943. An information was filed on the 25th day of October, 1954 in the County Court of Increased Jurisdiction of Benson County, North Dakota. The information charged the defendant with the commission of the crime of assault and battery. To this in-

formation the defendant entered a plea of guilty. Thereupon his attorney filed a motion in arrest of judgment on the ground that the court had no jurisdiction of the offense charged in the information for the reasons that the defendant and the complaining witness were both Indians enrolled upon the records of the Devils Lake Sioux Indian Reservation as members of the Devils Lake Sioux Indian tribe and wards of the government of the United States of America; that the offense charged "was committed on lands allotted to an Indian, the title to which is held in trust by the United States of America and is within the exclusive jurisdiction of the government of the United States of America".

Thereafter the attorneys filed briefs and argued the motion before the court. On November 23, 1954, the court denied the motion. Counsel, both for the state and the defendant, then made application to the court for the certification to the supreme court of the following question:

"Does the Benson County Court, being a Court of increased jurisdiction, have jurisdiction over the offense charged in the information filed herein in view of The Organic Law (Chapter 86, 12 U.S.Stat. 239), the Enabling Act (25 U.S.Stat. 676), Article 16, Section 203 of the Constitution of North Dakota, the Act of Congress of May 31, 1946 (60 Stat. 229), the Act of Congress of February 19, 1867 (15 Stat. 505), the Act of Congress of February 14, 1873 (17 Stat. 456), and the Act of Congress of June 24, 1874 (18 Stat. 167)."

■ The court granted the application and certified the question to us for determination, "because this is a public question of great importance to the Indian People of the Fort Totten Indian Reservation, and to the law enforcement officials and the courts of Benson County, North Dakota, and because there is an issue of law involved in this case, the interpretation of which is in doubt and vital, and principally determinative of the issues in this case, * * *"

It appears clearly that the proceedings were in accordance with the requirements of Chapter 32-24, NDRC 1943. State v. Elkin, 68 N.D. 93, 277 N.W. 89. We will therefore proceed to answer the question.

What is now North Dakota was in early times occupied and controlled by bands of roving Sioux Indians.

On March 2, 1861, Congress enacted Chapter 86, 12 U.S.Statutes at Large, page 239, providing for the organization of the Territory of Dakota and for temporary government thereof. That statute is known as the Organic Law. Among the provisions thereof is the following:

"Provided, That nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the Indians in said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, * * * or to affect the authority of the government of the United States to make any regulations respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been competent for the government to make if this act had never passed * * *."

In 1867 the Devils Lake Indian Reservation was established by a treaty with the Sissiton and Warpeton Bands of the Dakota or Sioux Indians. According to that treaty those bands had been friendly during the Sioux Indian outbreak in 1862 and had been of assistance to the United States. Furthermore, Sioux annuities and reservations had been confiscated without any provision having been made by congress for the support of those friendly bands who had consequently suffered from want of subsistence and clothing. Now they had asked, through their representatives, for recognition and some help to enable them to take up agricultural life. In consideration of these matters the Devils Lake and other North Dakota reservations were set up for those friendly bands of Indians. In that treaty provisions were

made for the gradual allotment of such lands to individual Indians who desired to engage in agriculture and funds were to be provided for their needs and assistance in making such change in their method of living. Provision was also made authorizing the Indians to adopt rules and regulations for the security of their lives and property and for the advancement of the civilization and agricultural prosperity of members of said bands. All such rules, however, were subject to the sanction of the government agent. This treaty was ratified by the Act of Congress April 15, 1867, 15 U.S. Statutes at Large, page 505.

On June 7, 1872, 17 Stat. 281, that treaty was amended to include a provision in which these bands of Sioux Indians ceded, sold, and relinquished to the United States all their right, title, and interest in the territory described in the Treaty of April 15, 1867, excepting therefrom that portion particularly described as a permanent reservation for occupancy and cultivation by them which was at that time being occupied and alloted to them under that treaty. In consideration of the amended treaty, an appropriation was made for the payment of the first installment of eighty thousand dollars to be used for the development of farming and civilization on the reservation. 17 U.S.Statutes at Large, page 456. A second installment payment under the Treaty of April 15, 1867, was made by the Act of Congress of June 22, 1874, 18 U.S.Statutes at Large, page 167. No other promises were made to the Indians in those treaties as to the disposition or government of the lands ceded.

By these various acts the Devils Lake Sioux Indian tribes ceded to the United States all their right, title and interest to the lands constituting the Devils Lake Sioux Indian Reservation and congress was given absolute authority not only over the lands but also over the Indians occupying them as shown by the provision of the Organic Law heretofore quoted.

In 1889 congress provided for the division of the territory of Dakota into two states, North Dakota and South Dakota, and for the admission into the Union of North Dakota, South Dakota, Montana and Washington. 25 U.S.Statutes at Large, Chapter 180, page 676. This law, known as the Enabling Act, provided for the holding of constitutional conventions in the different states and made provisions for the states to be admitted into the Union "on an equal footing with the original States".

It is also provided therein:

"And said conventions shall provide, by ordinances irrevocable without the consent of the United States and the people of said States:

"First. * * *

"Second. That the people inhabiting said proposed States do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, *and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States; * * *.*"

Then follow provisions to keep said lands tax exempt except as provided in the act or by other acts of congress.

In accordance therewith Article XVI, Section 203 of the Constitution of North Dakota provided the following with the same preamble of irrevocability:

"The people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States, the same shall be and remain

subject to the disposition of the United States, *and that said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States; * * *."*

It is contended on behalf of the defendant that because of the provisions in the Enabling Act and the Constitution, which we have italicized, North Dakota has no jurisdiction in any manner over the Indian lands or the Indians on the reservation.

Montana and South Dakota, admitted under the same enabling act as North Dakota, have the above provision in their constitutions. Different aspects of the question here involved have been before the federal courts and the courts of these states.

A study of those sections of the Enabling Act and the Constitution and the interpretation thereof as given in those cases shows that congress retained for the United States, and the people of North Dakota disclaimed all right, title, and interest to the unappropriated public lands and to the Indian lands within the state and that it was agreed that such Indian lands should remain subject to the disposition and control of the United States and should never be taxed as long as the title remained in the United States.

There is no reservation, however, of jurisdiction or control in the United States over any part of the unappropriated public lands as distinguished from Indian lands. It has been repeatedly held that people settling on those public lands were subject to the laws of the state and that their personal property was subject to taxation. See State ex rel. Tompton v. Denoyer, 6 N.D. 586, 593, 72 N.W. 1014.

The meaning of the provision in the Enabling Act and the Constitution that "said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States" is not so clear. That such provision was not necessary for the retention of title to those lands in the United States, or the disclaimer thereof by the state, is shown by the fact

that such jurisdiction was not reserved over the unappropriated public lands.

To get the legislative intent in the use of that provision the facts existing as the background for its use may be considered. Hoellinger v. Molzhon, 77 N.D. 108, 41 N.W.2d 217, 19 A.L.R.2d 1147; 16 C.J.S., Constitutional Law, § 30, page 68.

The United States had taken over possession of these lands from the Indians and in return had assumed obligations to help the Indians change from a nomadic life to a life of agriculture. The government had bound itself by treaties to aid the Indians in the progress of that change in their habits of life and to protect them during that time. The government had in a sense assumed the position of guardian of the Indian people. Under its guardianship the government had to provide civilizing influences like schools and churches. It had to teach them the rudiments of agriculture and aid them in the development thereof. The government had to protect them from being defrauded in their dealings with their more able and aggressive white neighbors as long as they were not sufficiently advanced in their new method of life to take care of themselves. It also was the duty of the government to see that justice prevailed if they got into trouble, either among themselves or with others. Finally the government had agreed to allot those lands severally to the Indians when they were sufficiently advanced in civilization to take care of themselves.

This history must be taken into consideration in determining the meaning of the phrase "absolute jurisdiction and control over Indian lands." That means more than the title to the Indian lands which was secured for the United States in the first part of the section. On these lands the United States was caring for its wards, the Indians, and aiding them in acquiring the habits of civilization. During that time the jurisdiction over the Indians and their lands had been absolute in the United States. The Organic Law under which the Territory of Dakota was organized pro-

vided that nothing in the act should impair the rights of the Indians in the territory or "affect the authority of the government of the United States to make any regulations respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been competent for the government to make if this act had never passed * * *." The provision in the Enabling Act and the Constitution is that the title to the Indian lands shall *"remain* subject to the disposition of the United States, and said Indian lands shall *remain* under the absolute jurisdiction and control of the Congress of the United States". Webster's New International Dictionary defines "remain" as "To continue unchanged in place, form or condition or undiminished in quantity, or to abide; endure; last; continue;"

Undoubtedly congress and the constitutional convention intended this reservation of jurisdiction over the Indian lands to cover jurisdiction over the Indian people living on them as well as the lands themselves as provided in the Organic Law. That was necessary in order to give the government the opportunity to control and protect the Indian people living on them and thus carry out and fulfill its obligations under the treaties without hindrance.

There was sound reason for the reservation by congress of jurisdiction over the Indians to that extent. The Indians had at least possessory rights over the lands constituting the territory of Dakota. They had ceded those lands to the United States on the promise of the United States that they would be protected and aided in learning and becoming established in the new ways of life. The government owed them that obligation. When viewed in this light it is clear that the Indians were the responsibility of the United States and that the United States should retain complete control over them and their lands until that obligation was fulfilled.

There also appears to have been a very good reason why the members of the constitutional convention in behalf of their constituents were just as anxious to refrain

from all responsibility for the Indians until the government had fulfilled its obligations so that further guardianship was not necessary. During the time of that tutelage there would necessarily be considerable expense and trouble. During that time the state was prohibited from taxing the Indian lands and Indian property. There was good reason why the pioneers of Dakota were unwilling to assume any responsibility for the conduct and care of people in that state of embryo civilization then existing among the Indians.

The case of State ex rel. Tompton v. Denoyer, 6 N.D. 586, 594, 72 N.W. 1014, 1017, supports this interpretation. In that case Judge Bartholomew thoroughly reviews the situation regarding Indians at the time of the enactment of the Constitution and the cases bearing on that section. After quoting the first part of the section he says:

"Thus far the statute is dealing with the title to the land only, and the unappropriated public lands and lands owned or held by an Indian or Indian tribes are placed upon the same basis or footing so far as the right of the United States to dispose of the title is concerned. *But the statute immediately adds, 'and that said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States.' This provision applies to the Indian lands only, and it is not confined to the matter of title. It deals with a jurisdiction that extends to the lands themselves, and must have intended a more enlarged jurisdiction than was conferred by the preceding language.* * * * The reasons which actuated congress in thus retaining *the broader jurisdiction over the Indian lands are perfectly apparent.* These Indian lands are now universally held by the Indians under some treaty or contract with the United States, and common good faith required congress to retain all the jurisdiction over these lands necessary to enable the United States to fulfill its treaty and contract obligations. More-

over, a well-recognized moral obligation rests upon the general government to care for these unfortunate wards of the nation. This duty cannot be performed unless the general government retains the right to exclude the white race from the Indian lands; otherwise, the Indian will be speedily dispossessed. Government must retain the power to establish agencies, erect school houses and churches, and introduce all desired civilizing influences, without being in any manner dependent upon the state. This increased jurisdiction was required for the best welfare of the Indian, and was in line with the government policy which seeks to convert the nomadic savage into the civilized citizen." (Emphasis supplied.)

In the South Dakota case of United States v. Ewing, D.C., 47 F. 809, 813, the federal court says:

"The reservations and provisions found in the act creating the territory of Dakota and the state of South Dakota, whereby there is reserved to the United States the absolute jurisdiction and control over the Indian lands, were unquestionably included therein for the purpose of preventing any question arising as to the continued power and control of the United States over the Indian country, such continued power and control being necessary to enable the United States to discharge its treaty obligations and duties to the Indians. It is argued by counsel that the reservation of absolute jurisdiction and control over the Indian lands contained in the omnibus act is to be confined to the mere matter of the ownership of the title and control of the right of taxation, but such limited construction is not admissible. The reservation was meant to be as broad as the duty which the United States assumed in regard to these lands, which was to secure to the Indians the peaceful possession thereof as their home, and to protect their persons and property thereon."

Montana was admitted under the same Enabling Act as North Dakota and its constitution contains the same clause with regard to jurisdiction over Indian lands. In the case of United States v. Partello, C.C., 48 F. 670, 675, the court analyzes the meaning of those clauses.

While in the final decision in that case the court erred in holding that the jurisdiction retained by the United States was in excess of that necessary to perform its treaty obligations to the Indians, and included jurisdiction of crimes committed by non-Indians against non-Indians on Indian lands, we nevertheless believe the reasoning of the court is valid in demonstrating that the intention of the provision under consideration was to retain in the United States the jurisdiction to fulfill its treaty obligations by prosecuting crimes by and against Indians, when committed on Indian lands, the court said:

"The question here presented is, what did congress intend by the clause, 'and said Indian lands shall remain under the absolute jurisdiction and control of the United States;' and what did the convention that framed the Montana constitution intend by it? * * * In the first part of the portion of section 4 of said act quoted above it appears that, as an individual proprietor, the United States was fully protected in regard to its rights to Indian lands, and the Indians were protected in their rights of occupancy. It does not seem that the clause under consideration could add anything to the rights of the United States in regard to these lands as a proprietor. * * * It was agreed by the ordinance above referred to that congress was to retain the absolute jurisdiction and control over these Indian lands within the Indian reservations in Montana. The word 'jurisdiction,' as used in the above clause, when applied to congress, means the power of governing such lands; to legislate for them; the power or right of exercising authority over them. * * * When

we say congress has the right to legislate for a place within its exclusive jurisdiction, we mean for the people who are there, as well as concerning the land itself."

That this jurisdiction was limited to, and included jurisdiction to enforce all laws upon Indian lands in so far as required by its treaty obligations to the Indians, we think is well settled.

In State v. Denoyer, supra, Judge Bartholomew, says:

"These authorities establish firmly the proposition that the jurisdiction reserved by the enabling act was not an exclusive jurisdiction. It did not take Indian lands out of the jurisdiction of the state where located, in the sense that the lands in another state are excluded. The United States retained all jurisdiction necessary for the disposition of the land and the title thereto; all jurisdiction necessary to enable it to carry out all treaty and contract stipulations with the Indians; all jurisdiction necessary to enable it to protect and civilize its unfortunate wards. But the state had jurisdiction to tax the property of its citizens within the reservation, to enter thereon for the purpose of enforcing, by levy and sale, the collection of such tax. It had jurisdiction to punish its citizens for crimes committed one against the other thereon."

This holding was confirmed in State ex rel. Baker v. Mountrail County, 28 N.D. 389, 393, 149 N.W. 120, 121, where Judge Fisk, speaking for the court, says:

"While it still retains a limited or qualified jurisdiction for certain purposes over such lands, the Congress of the United States relinquished to the territory of Dakota by the *Organic Act,* and to the state of North Dakota by the *Enabling Act,* all jurisdiction and governmental authority over these lands and the inhabitants residing thereon not thus *specially reserved to itself."* (Emphasis supplied.)

Our latest holding on this matter is in State v. Kuntz, N.D., 66 N.W.2d 531, where we said:

"State courts generally have jurisdiction over offenses committed on Indian reservations by persons who are not Indians against other persons who are not Indians," but "do not have jurisdiction over crimes committed on the Fort Berthold Indian Reservation by one who is not an Indian against one who is an Indian."

This court has also held that where others than Indians occupied the Indian lands they were subject to state laws. In La Duke v. Melin, 45 N.D. 349, 177 N.W. 673, 676, it is held that:

"Even if such lands be deemed part of an Indian reservation, the property of persons other than Indians situated thereon might be subjected to taxation by the laws of this state."

In the case of Anderson v. Brule County, 67 S.D. 308, 313, 292 N.W. 429, 431, the court says regarding this matter:

"That these and similar provisions in other enabling acts and constitutions of the several states were inserted for the purpose of maintaining ample supreme powers on the part of the United States to permit it to fully respond to its legal and moral obligations to the Indians rather than for the purpose of withholding power from the states to exercise jurisdiction over the reservations, and that it was intended the states should exercise a limited jurisdiction over Indian reservations within their exterior boundaries, are settled propositions. Draper v. United States, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419; Lebo v. Griffith, supra (42 S.D. 198, 173 N.W. 840); King v. McAndrews, supra, C.C., 104 F. 430; State ex rel. Tompton v. Denoyer, 6 N.D. 586, 72 N.W. 1014; State ex rel. Baker v. Mountrail County, 28 N.D. 389, 149 N.W. 120; Porter v. Hall, 34 Ariz. 308, 271 P. 411; Red

Hawk v. Joines, 129 Or. 620, 278 P. 572, 577; 31. C.J. 531."

After reviewing the authorities on jurisdiction over Indian lands, Judge Bartholomew, in State ex rel. Tompton v. Denoyer, supra, 6 N.D. 586, 72 N.W. 1019, says:

"And the principles of these decisions logically and necessarily lead further, *and give the state the right to extend to its citizens lawfully upon such Indian lands all the privileges and immunities of the laws of the state, where the same in no manner conflict with the reserved jurisdiction of the United States.* And this construction places the enabling act in entire harmony with the Dawes bill." (Emphasis supplied.)

Other cases holding that all jurisdiction over Indian affairs on the reservation is reserved in congress but all other matters are subject to the jurisdiction of the state are Draper v. United States, 164 U.S. 240, 17 Sup.Ct. 107, 4 L.Ed. 419; State v. Monroe, 83 Mont. 556, 274 P. 840; Truscott v. Hurlbut Land & Cattle Co., 9 Cir., 73 F. 60.

The United States Government has pursued a policy of aiding the Indians and trying to prepare them for a life that would make them self supporting and independent at which time United States obligations to the Indians would be completed.

■ The information in this case, after alleging the crime of assault and battery charges:

"That at said time and place and upon Indian land, the title to which is held in trust by the United States of America for the surviving heirs of the original allottee, one Frowling, The Indian title to which has not been extinguished, and which Indian allotment is located within the Devils Lake Sioux Indian Reservation and within the said County of ·Benson, the said Leonard Lohnes residing upon said reservation, did ·wilfully, wrongfully · and unlawfully beat and slap one Mary Lohnes' about' the · body with his hands, the said Leonard Lohnes and Mary Lohnes at·said time both being enrolled Indians of the Devils Lake Sioux Indian Reservation and wards of the Government of the United States of America."

The defendant's plea of guilty to the charge containing that statement is an admission that he is a ward of the government. Consequently, the reservation of jurisdiction and control over him is within the reservation of jurisdiction in the United States made in the Enabling Act and agreed to by the state in the Constitution.

It is contended, however, on behalf of the state in this case that congress has by the Act of May 31, 1946, transferred to the State concurrent jurisdiction over criminal offenses by or against Indians on the Devils Lake Sioux Indian Reservation. The Act reads as follows:

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That jurisdiction is hereby conferred on the State of North Dakota over offenses committed by or against Indians on the Devils Lake Indian Reservation in North Dakota to the same extent as its courts have jurisdiction generally over offenses committed within said State outside of Indian reservations: Provided, however, That nothing herein contained shall deprive the courts of the United States of jurisdiction over offenses defined by the laws of the United States committed by or against Indians on said reservation; nor shall anything herein contained deprive any Indian of any protection afforded by Federal law, contract, or treaty against the taxation or alienation of any restricted property." 60 U.S. Statutes at Large, page 229.

While this grants the state only concurrent jurisdiction it does grant jurisdiction to the state over offenses committed by or against Indians on the reservation generally. It makes a change from the exclusive jurisdiction over Indians reserved in the United States by the Enabling Act, and

granted by the Constitution. It transfers some of that exclusive jurisdiction from the United States to the state.

The Enabling Act provided that the constitutional conventions should enact certain ordinances under the condition that they should be "irrevocable without the *consent of the United States and the people of said States*". Section 4, Chapter 180, 25 U.S. Statutes at Large, page 676. Article XVI of the Constitution of North Dakota accepted that condition. One of the ordinances provided by the Enabling Act and enacted by the Constitution under that condition is Section 203, Article XVI, North Dakota Constitution, heretofore quoted, including the provision "that said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States". It was thereby required by Congress, agreed to by the Constitutional Convention and approved by a vote of the people in adopting the constitution that absolute jurisdiction and control of the Indian lands and people was retained in the United States and that that provision should not be changed without the consent of the United States and the people of North Dakota. That is a compact between the United States and the people of North Dakota that needs the consent of both parties for any change in the jurisdiction over Indians.

There was good reason for that agreement. Both parties should have a say in whether the government had fulfilled its obligations and whether the Indians in North Dakota had become sufficiently advanced in civilization to become self-supporting, tax paying citizens.

The Act of May 31, 1946, conferring upon the State of North Dakota concurrent jurisdiction over all offenses by or against Indians on the Devils Lake Sioux Indian Reservation is a consent by the United States to that change in the original provision governing jurisdiction over the Indians. There is, however, no consent to that change by the people of North Dakota. Before that change as provided by the Act of May 31, 1946, can become effective consent thereto has to be given by the people of North Dakota. Until that is done jurisdiction over the Indian offenses on the Devils Lake Sioux Indian Reservation is absolute in the United States.

It follows that the answer to the certified question must be, No. The County Court of Increased Jurisdiction of Benson County, does not have jurisdiction in the case at issue.

BURKE, C. J., and JOHNSON, J., concur.

MORRIS, Judge (dissenting).

On July 1, 1954, the defendant, Leonard Lohnes, committed assault and battery upon the person of Mary Lohnes. At the time of the assault both were enrolled Indians of the Devils Lake Sioux Indian Reservation and wards of the Government of the United States of America. The assault took place upon Indian land, the title to which is held in trust by the United States of America for the surviving heirs of the original allottee. This land was located within the Devils Lake Sioux Indian Reservation and the Indian title thereto had not been extinguished.

On May 31, 1946, the Congress of the United States enacted the following statute:

"That jurisdiction is hereby conferred on the State of North Dakota over offenses committed by or against Indians on the Devils Lake Indian Reservation in North Dakota to the same extent as its courts have jurisdiction generally over offenses committed within said State outside of Indian reservations: *Provided, however,* That nothing herein contained shall deprive the courts of the United States of jurisdiction over offenses defined by the laws of the United States committed by or against Indians on said reservation, nor shall anything herein contained deprive any Indian of any protection afforded by Federal law, contract or treaty against the taxation or alienation of any restricted property." 60 U.S. Statutes at Large, page 229.

518

The Devils Lake Indian Reservation is "Indian country." Title 18, U.S.C.A. § 1151.

It is the general rule that the jurisdiction of a state extends over Indian country within its borders except as limited or reserved by Indian treaties or federal laws. State v. Jackson, 218 Minn. 429, 16 N.W.2d 752; State ex rel. Du Fault v. Utecht, 220 Minn. 431, 19 N.W.2d 706, 161 A.L.R. 1316; People v. Carmen, Cal., 265 P.2d 900. See also State ex rel. Olson v. Shoemaker, 73 S.D. 120, 39 N.W.2d 524.

On the other hand, it is the general rule that in the absence of legislation by congress conferring jurisdiction upon state courts they have no jurisdiction of crimes committed by tribal Indians on Indian reservations. State v. Rufus, 205 Wis. 317, 237 N.W. 67; United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228; Konaha v. Brown, 7 Cir., 131 F.2d 737; Williams v. United States, 327 U.S. 711, 66 S. Ct. 778, 90 L.Ed. 962; Nephew v. State, 178 Misc. 824, 36 N.Y.S.2d 541; State v. Kuntz, N.D., 66 N.W.2d 531.

But in the case before us we have the act of May 31, 1946, above quoted, which purports to confer jurisdiction on the State of North Dakota over offenses committed by or against Indians on the Devils Lake Indian Reservation. This jurisdiction is not exclusive but concurrent, and it would seem at this point that the statute settles the matter and that effective concurrent jurisdiction has been conferred upon the courts of North Dakota over offenses committed by or against Indians. But solution of our problem is not so easy.

It is pointed out that there is embedded in the Enabling Act which authorized North Dakota's admission into the Union and in the Constitution of the State of North Dakota a disclaimer of jurisdiction "irrevocable without the consent of the United States and the people of this state" which it is contended prevents the effective vesting in the courts of North Dakota of criminal jurisdiction over the defendant in this case. Chapter 180, 25 U.S. Statutes at Large, page 676, Section 4; North Dakota Constitution,

Section 203. I quote the paragraph containing the disclaimer from the state constitution:

"Second. The people inhabiting this state do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, *and that said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States;* that the lands belonging to citizens of the United States residing without this state shall never be taxed at a higher rate than the lands belonging to residents of this state; that no taxes shall be imposed by this state on lands or property therein, belonging to, or which may hereafter be purchased by the United States or reserved for its use. But nothing in this article shall preclude this state from taxing as other lands are taxed, any lands owned or held by any Indian who has severed his tribal relations, and has obtained from the United States or from any person, a title thereto, by patent or other grant, save and except such lands as have been or may be granted to any Indian or Indians under any acts of congress containing a provision exempting the lands thus granted from taxation, which last mentioned lands shall be exempt from taxation so long, and to such an extent, as is, or may be provided in the act of congress granting the same."

I have italicized the language which it is contended thwarts the vesting of criminal jurisdiction involved in this case.

The entire paragraph of the state constitution quoted above deals primarily with lands, not with people. It deals with the soil, not with those residing thereon. If people are affected, it is because of some rights which they have or duties that they

owe arising out of or incident to their ownership or occupation of the lands. It is strenuously asserted that the italicized language was inserted for a purpose and must be given effect and to give it effect it must be construed to disclaim something more than the right and title to the land which was already under the exclusive ownership and jurisdiction of the United States. To this proposition I agree. But to give it effect does not require that it be construed to disclaim the sovereign police powers of the state or the right of the state to enforce its criminal laws whenever and wherever jurisdiction to do so has been relinquished to the state by the federal government.

It has long since been conclusively determined that the disclaimer in question was not territorial in import and effect. It did not exclude the jurisdiction of the state from the land as a territory within which the state might never exert its laws or make persons or property found therein amenable to its legal processes. It did not make Indian lands foreign soil with respect to the state and its courts. This was first determined in Truscott v. Hurlbut Land & Cattle Co., 9 Cir., 73 F. 60, which arose in the State of Montana. Montana was admitted to the Union under the same Enabling Act as North Dakota and its constitution contains the same disclaimer. In that case it was held that the disclaimer did not prevent the State of Montana or its counties from taxing cattle of a corporation grazing upon an Indian reservation under a contract with the Indians which was sanctioned by the United States.

Draper v. United States, 164 U.S. 240, 17 S.Ct. 107, 108, 41 L.Ed. 419, involved the murder of one negro by another on the Crow Indian Reservation in the State of Montana. Draper was convicted in the state court. Upon review in the United States Supreme Court he contended that the Enabling Act and the disclaimer provision of the Montana Constitution deprived the courts of the state of jurisdiction over all offenses committed on the Crow Indian Reservation. In denying the contention the court said:

"As equality of statehood is the rule, the words relied on here to create an exception cannot be construed as doing so, if, by any reasonable meaning, they can be otherwise treated. The mere reservation of jurisdiction and control by the United States of 'Indian lands' does not of necessity signify a retention of jurisdiction in the United States to punish all offenses committed on such lands by others than Indians or against Indians. It is argued that as the first portion of the section in which the language relied on is found disclaims all right and title of the state to 'the unappropriated public lands lying within the boundaries thereof and of all lands lying within said limits, owned or held by an Indian or Indian tribes, and until the title thereof shall be extinguished by the United States, the same shall be and remain subject to the disposition of the United States,' therefore the subsequent words, 'and said lands shall remain under the absolute jurisdiction and control of the United States,' are rendered purely tautological and meaningless, unless they signify something more than the reservation of authority of the United States over the lands themselves and the title thereto. This argument overlooks, not only the particular action of congress as to the Crow reservation, but also the state of the general law of the United States, as to Indian reservations, at the time of the admission of Montana into the Union."

The court then discusses Indian allotment statutes and particularly the act approved February 8, 1887, 24 U.S. Statutes at Large, page 388, which the court said "contemplated the gradual extinction of Indian reservations and Indian titles by the allotment of such lands to the Indians in severalty." It also noted that Indians not residing on a reservation or for whose tribe no reservation had been provided were authorized to enter a designated quantity of unappropriated public land and to have patents therefor, under certain regulations and restrictions comparable to the allot-

ments on reservations. Then the court says:

"From these enactments it clearly follows that at the time of the admission of Montana into the Union, and the use in the enabling act of the restrictive words here relied upon, there was a condition of things provided for by the statute law of the United States, and contemplated to arise, where the reservation of jurisdiction and control over the Indian lands would become essential to prevent any implication of the power of the state to frustrate the limitations imposed by the laws of the United States upon the title of lands once in an Indian reservation, but which had become extinct by allotment in severalty, and in which contingency the Indians themselves would have passed under the authority and control of the state."

It seems clear that the court in Draper v. United States looked upon the disclaimer as pertaining to Indian lands and the rights incident thereto rather than as disclaiming complete jurisdiction over the Indians themselves to the extent of forever forswearing in behalf of the state the right to enforce its criminal laws or to assert its police powers.

The majority opinion quotes from the case of United States v. Partello, 48 F. 670, in which it was held that the United States Circuit Court, District of Montana, rather than the courts of the State of Montana had jurisdiction over the crime of rape committed by a white man upon a white woman within the limit of the Crow Indian Reservation in the State of Montana. In so holding that case pursues to its logical conclusion the reasoning of the majority. But the case has been thoroughly discredited. Five years later the supreme court in Draper v. United States, supra, held that the state courts of Montana rather than the federal court had jurisdiction of the crime of murder on this same Crow Indian Reservation by a negro against another negro.

The majority also quotes from United States v. Ewing, 47 F. 809. It was there held that the United States District Court had jurisdiciton of an indictment against a white man for stealing the horses of an Indian on the Yankton Reservation in South Dakota. That decision is undoubtedly correct as to result but not as to the reason for it. The same result has been arrived at by the United States Supreme Court for different reasons where no disclaimer such as ours was involved. See Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820, Ann.Cas.1913E, 710. I have been unable to find where United States v. Ewing has been cited with approval.

In Porter v. Hall, 34 Ariz. 308, 271 P. 411, 414, the right to vote of certain Indians residing on reservations was challenged on the ground that they were not residents of the State of Arizona. The Enabling Act by which Arizona was admitted to the Union has a provision regarding Indian lands similar to ours and contains this language:

" 'that until the title of such Indian or Indian tribe shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States.' "

After quoting at length from Draper v. United States, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419, the Arizona court said:

"We have no hesitancy in holding, therefore, that all Indian reservations in Arizona are within the political and governmental, as well as geographical, boundaries of the state, and that the exception set forth in our Enabling Act applies to the Indian lands considered as property, and not as a territorial area withdrawn from the sovereignty of the state of Arizona."

The second point in that case was based upon the argument that the Indians were not entitled to vote because they were under guardianship. The court reviewed cases holding that Indians are wards of the nation and pointed out that the federal

statutes provide that Indians of the class of those under consideration, in case they commit a crime while on the reservation, are subject to the laws of the United States and not the laws of the State of Arizona and the court then said:

"And this is based on the fact that they are wards of the United States, and not that they are without the territorial jurisdiction of the State."

That is my position in this case. The federal criminal jurisdiction exercised over Indians in North Dakota by the federal government is based on the status of Indians as such rather than upon the lands on which they reside. When that jurisdiction is relinquished it falls to the state which has general criminal jurisdiction within its borders.

In commenting on Porter v. Hall, supra, in Harrison v. Laveen, 67 Ariz. 337, 196 P.2d 456, 458, it is said:

"The opinion in the last-mentioned case laid at rest the contention there made that members of Indian tribes residing on Indian reservations were not 'residents of the state of Arizona', as it was held that Indian reservations in Arizona are within political and governmental boundaries of the state, and limitations on state's jurisdiction in Enabling Act apply only to Indian lands considered as property, but do not withdraw territorial area from sovereignty of state and control of its laws."

In State ex rel. Tompton v. Denoyer, 6 N.D. 586, 72 N.W. 1014, 1017, this court held that under the act of February 8, 1887, 24 U. S. Statutes at Large, page 388, Indians and persons of Indian descent residing upon lands allotted to them in severalty and upon which preliminary patents had been issued were citizens of the United States and qualified electors of the state and that it was the duty of the county commissioners of Benson County to establish a voting precinct for them which was on the Devils Lake Indian Reservation and within the boundaries of Benson County. Thus the court reached the conclusion that the dis-

claimer under consideration did not affect the right or the duty of the county commissioners to establish on Indian lands a voting precinct in which the citizen residents of those lands might vote. In discussing the disclaimer the court says:

"This provision applies to the Indian lands only, and it is not confined to the matter of title. It deals with a jurisdiction that extends to the lands themselves, and must have intended a more enlarged jurisdiction than was conferred by the preceding language. Does it thereby create a jurisdiction as exclusive as in cases of lands ceded to the United States by a state for specific purposes, as hereinbefore considered? The reasons which actuated congress in thus retaining the broader jurisdiction over the Indian lands are perfectly apparent. These Indian lands are now universally held by the Indians under some treaty or contract with the United States, and common good faith required congress to retain all the jurisdiction over these lands necessary to enable the United States to fulfill its treaty and contract obligations. Moreover, a well-recognized moral obligation rests upon the general government to care for these unfortunate wards of the nation. This duty cannot be performed unless the general government retains the right to exclude the white race from the Indian lands; otherwise, the Indian will be speedily dispossessed."

Here, as in Draper v. United States, the court appears to have had in mind that by the provision under discussion there was placed beyond the power of the state any interference which would be detrimental to the Indians who occupied it with respect to their rights incident to or growing out of the land. The case is not authority for the proposition that the state disclaimed all jurisdiction with respect to crimes committed by Indians any more than it disclaimed jurisdiction of the crime of murder committed on Indian land by one negro against another, as was the fact in Draper v. United States, supra.

In State ex rel. Baker v. Mountrail County, 28 N.D. 389, 149 N.W. 120, 121, the court had before it the question of the right of the state to exercise political and·governmental jurisdiction and control over the Fort Berthold Indian Reservation sufficient to authorize it to include a part of the reservation within the political subdivision of the state known as Mountrail County. It was argued that the provision of Section 4 of the Enabling Act and subdivision 2 of Section 203 of our state constitution that "said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States" was exclusive as to the state's right to include Indian lands within boundaries of a county. Relying upon State ex rel. Tompton v. Denoyer, supra, the question was determined in favor of the right of inclusion and the court said:

*"While it still retains a limited or qualified jurisdiction for certain purposes over such lands,* the Congress of the United States relinquished to the territory of Dakota by the Organic Act, and to the state of North Dakota by the Enabling Act, all jurisdiction and governmental authority over these lands and the inhabitants residing thereon not thus specially reserved to itself."

Here again we find the court considering the jurisdiction retained as pertaining to the land while the jurisdiction relinquished to the State of North Dakota included both the land and the inhabitants residing thereon.

It might be well to also bear in mind that in those states in which the constitutional provision under consideration is not found the division of criminal jurisdiction with respect to crimes committed on a reservation is exactly the same as it is in those states containing the specific reservation of jurisdiction over lands which we are now considering. It is the rule stated in State v. Kuntz, N.D., 66 N.W.2d 531:

"State courts generally have jurisdiction over offenses committed on Indian reservations by persons who are not Indians against other persons who are not Indians." But "The courts of the State of North Dakota do not have jurisdiction over crimes committed on the Fort Berthold Indian Reservation by one who is not an Indian against one who is an Indian."

My conclusion is that the provisions of the Enabling Act and our constitutional disclaimer have no effect whatever upon the criminal jurisdiction of the state; that the state has general jurisdiction over reservations wholly within the state, excluding however, that jurisdiction which has been retained by the federal government over "Indian country" as long and only as long as that jurisdiction is asserted by the federal government and when the federal government cedes or confers criminal jurisdiction over Indian country to the state the federal restraint on the state's jurisdiction is removed and to the extent of that removal the jurisdiction of the state is automatically extended. My answer to the certified question is yes.

SATHRE, J., concurs in the foregoing dissent.